STATE of Wisconsin, Plaintiff-Respondent,

v.

Carl A. LEWIS, Jr., Defendant-Appellant.†

Court of Appeals

*No. 2009AP429–CR. Submitted on briefs January 14, 2010. —Decided March 31, 2010.*

2010 WI App 52

(Also reported in 781 N.W.2d 730.)

† Petition to Review denied w/o costs on 7/21/10.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John T. Wasielewski* of *Wasielewski & Erickson* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sally L. Wellman*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Neubauer, P.J., and Snyder, J.

¶ 1. BROWN, C.J. The main issue in this Sixth Amendment case concerns inculpatory statements made to a jailhouse cellmate by the defendant, Carl A. Lewis, Jr., after he had been provided counsel. The United States Supreme Court has announced the law in this area. Law enforcement is prohibited from using a surreptitious government agent (e.g., a fellow jail cellmate) to deliberately elicit incriminatory statements, by investigatory techniques that are the equivalent of direct police interrogation, in the absence of counsel or a valid waiver of counsel. We hold that this requires evidence of some prior formal agreement—which may or may not be evidenced by a promise of consideration —plus evidence of control or instructions by law enforcement. Here, Lewis's cellmate, Trenton Gray, had approximately one year earlier, executed a standard *federal* proffer, promising information which might lead to charging other individuals "in [that federal case] or *related* investigations." (Emphasis added.) There was

538

no promise for "continuing cooperation" beyond that. Therefore, we reject Lewis's argument that the proffer carried over to this case. Because Gray acted purely on his own in the hope of getting further sentencing consideration, we affirm. Lewis also raises another issue which we hold is waived.

## BACKGROUND

¶ 2. Lewis was originally charged with six counts of armed robbery, in violation of WIS. STAT. § 943.32(2) (2007–08),[1] six counts of false imprisonment, contrary to WIS. STAT. § 940.30, one count of first-degree reckless endangerment, per WIS. STAT. § 941.30(1), all as a party to a crime, and one count of possession of a firearm by a felon, under WIS. STAT. § 941.29(2)(a). Lewis went to a jury trial. Prior to the start of the trial, the court dismissed one count of armed robbery and one count of false imprisonment upon the State's motion. The remaining twelve counts proceeded to a jury trial.

¶ 3. All the charges stemmed from an incident that occurred during a party on January 19, 2007. A dice game was played at the party and Jamal Parks won a substantial amount of money from Cleotha Warfield. When Parks attempted to leave the party with his winnings, Warfield took exception. He grabbed Parks, pushed him back into the living room, displayed a gun and demanded all the money. A number of other persons, apparently relatives of Warfield, decided to display their guns too, including one who had a rifle. Lewis was identified as the man with the rifle. Guests were prevented from leaving and were told to get on the floor. Warfield and his cohorts then went around and relieved

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

the guests of their money and property. Warfield then announced that the guests could leave, but they should run because he was going to start shooting. The guests fled. Apparently, in an effort to accentuate Warfield's point, Lewis fired his rifle several times from the balcony. No one was hit. Lewis was later apprehended, charged, provided with counsel, had his initial appearance, and then was incarcerated pending trial when the incident involving his cellmate occurred.

¶ 4. The cellmate was Gray. Gray testified on direct examination that he was in the Kenosha county jail for a time, that he was a cellmate of Lewis's, that Lewis spoke to him about the robbery and that Lewis told him that he was shooting dice with some guys from Gary, Indiana, that those guys won all the money and, after the dice game was over, he and his brother and his cousins robbed the guys from Indiana. Lewis further told Gray that he had a rifle and the others had handguns, they made the Indiana guys lay down, and they then took their money and their "weed" out of their pockets. Lewis also told Gray how, once the people were let go, he went outside and shot the rifle at them about eight or nine times.

¶ 5. Gray was then asked why he decided to come forward with this information and Gray responded as follows:

> Well, basically I'm under agreement with the federal government to provide any information of criminal activity from other people as well as myself. So right now . . . it's my obligation basically to come forth with any information concerning anyone's criminal activity, including my own.

Gray explained that he was presently incarcerated in federal prison, that he was sentenced by the federal

court, that he got a long sentence as a result of a drug case and that, when he got sentenced, he made an agreement with the federal government to provide any information that he came across to assist law enforcement in general. He further commented that he understood that his information had to be truthful or he could be charged with perjury and a time reduction on his sentence would be totally out of the question. Gray told the jury that he had received no promises from the Kenosha district attorney's office in return for his cooperation, that his only agreement was with the federal authorities, and that they made no promises relative to this case.

¶ 6. On cross-examination, Gray explained that the long federal sentence means that, though he was thirty-one years old at the time of the trial, he would be sixty-two years old before he got out and he was looking for ways to reduce his time. He stated, contrary to what he testified to on direct, that he had not spent any time in the federal prison as yet, but was being moved around to different county jails; that although he was not guaranteed anything for his testimony in this case, he was hoping to receive some consideration; that he had provided some information of a similar type while housed in the Dodge county jail before being transferred to the Kenosha county jail; and that he had done the same in Milwaukee county.

¶ 7. Subsequently, the jury returned guilty verdicts on all twelve counts. Lewis then brought a postconviction motion, mainly focusing on Gray. Lewis contended that Gray's testimony violated his right to counsel. He noted that he had been provided with counsel since his initial appearance and that the discussion he allegedly had with Gray occurred while he was represented by counsel. He argued that the prosecutor

and the police therefore had an affirmative obligation not to act in a manner that circumvented or diluted the protection afforded by the right to counsel, citing *Maine v. Moulton*, 474 U.S. 159, 171 (1985). Lewis asserted that, by placing a "state agent" in his cell, the State had violated his right to counsel. He cited a concurring opinion by Justice Powell in *United States v. Henry*, 447 U.S. 264, 276 (1980), and stated that the State had an "affirmative obligation" not to act in a manner which would circumvent his right to rely on counsel as a medium between him and the State. The State's response to the motion showed that it had no quarrel with the law that it may not place a "state agent" in his cell so as to circumvent his right to counsel. Rather, the State argued that Gray was not a state agent and had acted on his own. The trial court set a hearing date.

¶ 8. At the hearing, the Kenosha police department's primary investigator for the case testified that he was the person who took Gray's statement. He testified that Gray had come forward, offering to provide information. Up until then, he had no knowledge of Gray and had nothing to do with his placement in the Kenosha jail. He also said he had nothing to do with placing Gray in a cell with Lewis and had no knowledge that anyone else in his department had anything to do with it either. He received information from federal authorities that Gray had some information relating to Lewis. So, he got a statement from Gray. He said that Gray told him about an agreement with federal authorities whereby he was obliged to report on any criminal activities of which he was aware. But, he testified, no promises were made by him to Gray, Gray received no consideration from him and he never spoke to Gray again after getting the statement.

¶ 9. Gray then testified. He testified that the federal government had placed him in the Kenosha county jail, which he described as a "federal holding facility," because, when he was at the previous holding facility in Dodge county, he had "informed on some guys" and was possibly moved "for safety considerations." He was then asked to review an exhibit described as the "proffer letter" by the federal government to him. He was asked if it was "fair to say" that the agreement required him to cooperate "in terms of the cases that [he was] already involved in in February of '06." Gray answered "yes" to this question. Gray also indicated that the federal government agreed not to use any of the information he provided against him. Gray admitted he was given no other promises regarding any information discovered afterwards—any information provided after 2006. He admitted that no law enforcement agency or officer ever promised anything to him in exchange for him providing information. He said he came forward in the hope that the government would take his willingness to inform into account. He testified that his conversations with law enforcement came *after* his conversations with Lewis and after he had been moved from Kenosha's jail to the Waukesha jail, at his request, so that he could be closer to his family. He testified that he inquired of the federal officials charged with housing him about giving some information in a Kenosha case and that is how Kenosha law enforcement became involved. He testified that no one from law enforcement directed him to have a conversation with Lewis and no one ever asked him to listen to or talk to Lewis in any way.

¶ 10. Gray testified that he was aware of how, as an informant, he was not allowed to question an inmate to get information. He said that this knowledge was

543

based upon past experience cooperating in giving information. He said that Lewis volunteered the information without prompting by him.

¶ 11. Gray also testified that he played "brother" to Lewis "and that Lewis opened up to him as Lewis got more confidence. Gray was asked if he had any other conversations with Lewis and he said that the two of them talked about it "off and on, periodically" and Lewis would ask him different questions about what he thought. He testified that, although he was promised nothing, he was told that it was "possible" that he would get a shorter sentence from the federal government. He testified that, initially, he was not even going to report what Lewis had told him. But, once he met Lewis's cousin, who apparently was also in the jail, and who Gray considered to be "brutal," Gray changed his mind. He thought that the cousin was going down the "road of destruction [and the cousin] was going to take Mr. Lewis with him." So, to stand up for his "morals," Gray decided to report on Lewis as well as the cousin.

¶ 12. Despite this testimony, Gray continued to construe the federal proffer to mean that "I'm obligated to provide truthful statements to the United States . . . that involves any crime that's directly against me or anyone else that's subject to doing any type of crime as long as they['re] doing it within my presence."

¶ 13. Lewis's counsel argued to the trial court that his reading of the federal case law is as follows. First, once the right to counsel has attached, law enforcement may not question his client anymore without his attorney being present and having the opportunity to "shut down" the interrogation. The law prevents the State from circumnavigating this prohibition through subterfuge and using jailhouse informants to interrogate. Second, circumnavigation need not be proven by some

express agreement between law enforcement and the cellmate targeting a specific person. All Lewis is required to show is that law enforcement *created a situation* likely to induce the defendant to make incriminating statements. Third, this is shown by evidence of some general promise by law enforcement to give consideration in exchange for cooperating and the subsequent placement of the informant in a jail environment. Hence, no specific consideration is necessary.

¶ 14. The State read the law differently. The State asserted that there had to be an agreement between law enforcement and the informant for the informant to be a state agent, that the agreement had to target a particular person, that there had to be consideration in return for the informant's cooperation, and that there had to be actual interrogation by the informant. The State produced the federal proffer and pointed out that it did not meet any of the prerequisites.

¶ 15. The trial court construed the proffer in the same manner as the State,[2] and it found that Gray's initiation of contact with Lewis was not at the behest of

---

[2] We acknowledge that we are in the same position as the trial court to read the written proffer. So, technically speaking, we would employ a de novo review of the document. *See State v. Toliver*, 187 Wis. 2d 346, 355, 523 N.W.2d 113 (Ct. App. 1994). Nonetheless, because the trial court heard evidence consisting of the *conduct* of the various governmental entities and Gray to see if the conduct was consistent or inconsistent with the court's interpretation, and made its ultimate findings with that evidence in mind, our review really becomes a mixed question of fact and law as far as construing the proffer is concerned. With this standard of review in place, we conclude that the proffer document is not the slightest bit ambiguous and does not in any way support Gray's testimony that the document required him to present continuing information of all that he learned relating to criminal activities unrelated to the circumstances of his

either federal or state government, that Gray did not even want to be in Kenosha county and did not even know he was coming to Kenosha, that although Gray has a history of providing information to the government concerning things shared by inmates with whom he was housed, it was a unilateral decision by Gray to volunteer this information and not the result of some affirmative duty brought upon Gray by the federal proffer. The trial court considered it important that there was no evidence showing whether Gray was sent to Kenosha with any instructions about what to do and how to go about it. The trial court recounted Gray's own statement that he initially decided he was not going to disclose anything about Lewis because of his young age, but eventually decided of his own volition to report what he heard because he thought Lewis was under the influence of a cousin who would steer Lewis down the wrong path. The trial court thought this was support for the proposition that Gray was under no compulsion to report what he heard. The trial court also mentioned that there was no consideration provided, that Gray was paid nothing, and that the federal proffer offered nothing as a quid pro quo for providing information against Lewis. The court concluded that what Gray did was totally of his own volition. From this determination, Lewis appeals.

## DISCUSSION

██

¶ 16. Our discussion must begin, as it almost always does, with the standard of review. In deciding whether a person is a government informant or agent

federal charges. Moreover, the trial court's findings regarding the conduct of the parties are not clearly erroneous. *See* Wis. Stat. § 805.17(2).

for purposes of this Sixth Amendment analysis, the determination regarding the relationship or understanding between the police and the informant is a factual determination. *United States v. Surridge*, 687 F.2d 250, 252 (8th Cir. 1982). Once these historical findings have been ascertained, it is a legal question whether the relationship or understanding found by the trial court is such that the informant's questioning has to be considered government interrogation. *Id*. This is an important distinction here, because Lewis makes the bold assertion that "Trenton Gray had an agreement with the federal government to reveal all that he knew or came to know regarding criminal activities." While that is what Gray testified to, that is not what the trial court found. The trial court stated:

> I don't read this [proffer] as a continuing agreement where they send him out to take statements from people involved in various alleged criminal activities throughout the state who are housed in county jails.
>
> The record here is replete with the fact that he has done so, but I don't think he's done so in response to this agreement. At least there is nothing in the agreement itself that would support that.

The court further found no oral agreement outside the proffer. The court's finding is supported by the plain reading of the proffer agreement and the evidence of record. So, Lewis is just wrong about what the facts are.

¶ 17. Those are the facts we are dealing with and, because those facts are not clearly erroneous, those are the facts that Lewis must deal with on appeal. We now move to the legal question.

¶ 18. Lewis's main contention, faced with the factual findings of the trial court, is that no agreement between the government and the informant, showing a

meeting of the minds, is necessary. Rather, he cites *Henry*, 447 U.S. at 274, where the Supreme Court held that by "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." Lewis asserts that the State knew of or should have known of Gray's past history of informing on his cellmates. Therefore, by placing Gray in a cell with Lewis, the State violated Lewis's right to counsel. Lewis points out that Gray had a case agent, a federal agent contact and a contact in the U.S. Attorney's Office all the while. So, the theory apparently goes, when Gray initiated his contact with Lewis, it was because the State allowed such a situation to be created.

¶ 19.　Since Lewis takes his cue from *Henry*, this is where we will begin our discussion of the law. In that case, Nichols, who previously had worked for the FBI as a paid informant, informed the FBI that he was being housed in the same cell block as Henry, a suspected bank robber. *Id.* at 266. The FBI told Nichols "to be alert to any statements made by the federal prisoners, but not to initiate any conversation with or question Henry regarding the bank robbery." *Id.* Nichols subsequently reported that he and Henry had engaged in conversation and, in so doing, Henry told him about the robbery. *Id.* The Henry Court began its analysis by noting that, under *Massiah v. United States*, 377 U.S. 201 (1964), the question to be decided was whether the government "deliberately elicited" incriminating statements. *Henry*, 447 U.S. at 270. The Court stated that, in deciding whether the facts in Henry's case met the *Massiah* standard, three factors were important. *Henry*, 447 U.S. at 270. First, Nichols was acting under instructions as a paid informant for the government.

548

*Id.* Second, Nichols was ostensibly no more than a fellow inmate of Henry's. *Id.* Third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols. *Id.* The Court noted that Nichols had been a paid informant for more than one year, the FBI knew that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicions, and the arrangement with Nichols was that he was to be paid on a contingent-fee basis so that he was paid only if he produced useful information. *Id.* The Court held that Nichols was therefore a government agent. *Id.* at 271, 273. The Court noted, further, that this was so even though he was told to be a passive listener rather than an affirmative conversationalist because Nichols testified that he "had some conversations" with Henry. *Id.* at 271.

¶ 20. Applying the three-factor test to this case, the third factor, the custody of the defendant is clearly present. So is the second factor, that the informant (Gray) was a fellow inmate. The first factor, however, is not present. Gray was never under the direction or control of the government, and there was no evidence that Gray received instructions from the government about Lewis or anyone else in the Waukesha county jail. Nor was he ever a paid informant.

¶ 21. Lewis appears to make the argument that, even though Gray had no explicit agreement from anyone in the government, he "hoped" that, if he cooperated, his federal sentence might be shortened. Lewis seems to assert that there does not have to be a "top-down" arrangement whereby he is controlled to do something in return for some kind of reward for his efforts. He points out that, in *Henry*, the Court noted how Nichols worked on a contingent-fee basis as he

549

"was to be paid only if he produced useful information."
*See id.* at 270. Lewis argues, based on his reading of
*Henry*, that if the government creates a situation
whereby a person predisposed toward giving informa-
tion in the hope of a possible reward is in a jailhouse
setting, then—if the government does nothing to pre-
vent the situation from occurring—that predisposed
person is an agent when information is retrieved,
agreement or no agreement, control or no control.

¶ 22. As it happens, that very argument (that the
*hope* of a benefit rather than a *promise* of a benefit
meets the first condition of *Henry*) was discussed and
rejected in *Surridge*. There, Surridge noted that, even
though the informant (a supposed friend of Surridge's)
was not paid for the incriminating information he
provided, and never had any kind of agreement or
instructions with the government, a bankers' associa-
tion had announced that there would be a "reward" for
information. *Surridge*, 687 F.2d at 252, 254. Surridge
argued that, because the police knew about the "re-
ward" being offered by a bankers' association and be-
cause the friend met with police and offered to find out
from Surridge where the money was hidden, and be-
cause the police allowed the friend to visit Surridge in
the jail, the friend had to be classified as a government
agent because of the situation which the police allowed
to present itself. *Id.* at 254. The *Surridge* court pointed
out, however, that police were unaware of the friend's
interest in the reward and also noted that the reward
was being offered by the bankers' association, not the
police. *Id.* The police also had no idea that the friend
thought he might be able to sell his business product
(leather goods) to the police in exchange for informa-
tion and had no idea that the friend was also interested
in receiving Surridge's truck. *Id.* The *Surridge* court

then explained that Surridge was missing the point of *Henry*: the significance of government payment which would evidence an agreement. *Id.* The *Surridge* court wrote:

> As mentioned before, the key issue is the extent of government involvement. When the government pays the informant, it is evidence (although not conclusive) that a prior agreement between the government and the informant existed, whether that agreement was explicit or implicit. In the instant case, the police did nothing after the meeting to give a benefit to Spencer which would have evidenced an implicit agreement between Spencer and the police.

*Id.*

¶ 23. We adopt the rationale of *Surridge*. The fact that the government might know an informant "hopes" to receive a benefit as a result of providing information does not translate into an implicit agreement between the government and the informant if the informant is thereafter placed into an environment where incriminating information can be obtained. If there is just "hope" and nothing else, then the informant cannot be construed to be a government agent, eliciting a statement in violation of the Sixth Amendment. As the court in *United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982) stated, "We refuse to extend the rule of *Massiah* and *Henry* to situations where an individual, acting on his [or her] own initiative, deliberately elicits incriminating information."

¶ 24. Lewis makes a correlative argument that if the government knows or should know that an inmate has provided information in the past and given it to police, the government has an affirmative duty to refrain from creating a situation whereby that infor-

mant is in a position to offer information on a jail cellmate in a future instance. This argument, too, has been discussed and rejected by various courts. The *Malik* court underscored that the government has to play a knowing role in the placement of the informant into a jailhouse situation; it cannot be held accountable just because things occur by happenstance. *See id.* The court stated:

> The Maliks suggest that the Government must go to extraordinary lengths to protect defendants from their own loose talk; they suggest that potential informants be segregated from other inmates. We do not believe that the Sixth Amendment right to counsel requires the Government to take such steps.

*Id.*

¶ 25. Lewis does not make the exact assertion made by the defendant in *Malik*—that the government has a duty to segregate prisoners. But, bottom line, that is his argument. Gray was being housed in the Kenosha county jail. Lewis was housed there as his cellmate. Lewis is really contending that the government somehow had an affirmative duty to know Gray's past history as a jailhouse informant and to keep Gray away from Lewis. For the reasons that this definition of "affirmative duty" was rejected in *Malik*, we likewise reject it. To sum up the discussion, we quote the *Surridge* court again:

> [W]e do not think the police have a duty to bar visits with potential informants; indeed such a requirement would be unfair to prisoners. Also, when a person offers to assist the police, we do not think the police must try to stop the person from providing assistance. *As long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by*

> *a private citizen, such questioning does not violate the [F]ifth or [S]ixth Amendments.*

*Surridge,* 687 F.2d at 255 (emphasis added). The italicized portion says it all and is the holding of this court.[3]

¶ 26. There is one other issue. As we said at the outset, Lewis was charged with fourteen counts. The day before the jury trial commenced, without objection by the defense, the trial court granted the State's motion to dismiss two counts (counts 9 and 10) involving Antoine Murray, because Murray was not available for trial. On the first day of trial, during voir dire, the trial court gave its normal house-cleaning instructions to the jurors, but, in so doing, told the jurors: "And you'll note there are two counts here that have been otherwise disposed of which is of no concern to you as to their disposition." Then later, after trial and during the final instructions to the jury, the trial court made a similar comment. Again, there was no objection. Now, on appeal, Lewis claims that the brief instruction during voir dire deprived him of a fair trial because the jury might have speculated that the two missing charges had already resulted in convictions. This issue is waived. *See State v. Smith,* 170 Wis. 2d 701, 714 n.5, 490 N.W.2d 40 (Ct. App. 1992). There is a strong argument to enforce waiver here because, had there

---

[3] We can perceive a situation where an inmate may offer to or agree to act as an information agent on another inmate for reasons other than quid pro quo benefit. Yet, there would still be evidence of both an agreement between the government and the inmate and control or directions by the government. Therefore, we do not list "consideration" as an absolute requirement before an agency relationship can be found. Common sense dictates, however, that there will be consideration in most instances.

been a contemporaneous objection, it could easily have been corrected. Moreover, the possibility of prejudice is so speculative and implausible that it would be a waste of judicial resources to discuss it.

*By the Court.*—Judgment and order affirmed.