# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2019AP2065

†Petition for Review Filed

Complete Title of Case:

**STATE OF WISCONSIN,**

†**PLAINTIFF-RESPONDENT,**

**V.**

**RICHARD MICHAEL ARRINGTON,**

**DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | April 6, 2021 |
| Submitted on Briefs: | September 8, 2020 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:        On behalf of the defendant-appellant, the cause was submitted on the briefs of *Suzanne L. Hagopian*, assistant state public defender, Madison.

Respondent
ATTORNEYS:        On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general, and *Sara Lynn Shaeffer*, assistant attorney general.

## COURT OF APPEALS
## DECISION
## DATED AND FILED

### April 6, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.**

Appeal No.     **2019AP2065-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CF516**

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

RICHARD MICHAEL ARRINGTON,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County:  TIMOTHY A. HINKFUSS, Judge.  *Reversed and cause remanded for further proceedings*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1     SEIDL, J. Richard Arrington appeals from a judgment, entered following a jury trial, convicting him of first-degree intentional homicide with use of a dangerous weapon, as a repeater contrary to WIS. STAT. §§ 940.01(1)(a),

939.63(1)(b), and 939.62(1)(c) (2019-20),[1] and of being a felon in possession of a firearm, as a repeater, contrary to WIS. STAT. §§ 941.29(1m)(b) and 939.62(1)(b). Arrington also appeals from an order denying him postconviction relief. He argues: (1) the State violated his Sixth Amendment right to counsel when it allowed a confidential informant named Miller to record certain conversations with Arrington; and (2) the violation of his right to counsel warrants a new trial on the basis of plain error or ineffective assistance of counsel.

¶2    We conclude the State violated Arrington's Sixth Amendment right to counsel when Miller made the recordings of conversations with Arrington while acting as an agent of the State. In addition, Arrington's counsel's failure to seek suppression or otherwise object to the admission of the recordings deprived Arrington of the right to effective assistance of counsel. We therefore reverse and remand for a new trial in which the recordings and Miller's testimony regarding the jailhouse conversations with Arrington will be excluded.

## BACKGROUND

¶3    On April 2, 2016, Ricardo Gomez died of a single gunshot wound suffered when he was standing outside of a house on Day Street in Green Bay. The State subsequently charged Arrington with first-degree intentional homicide and possession of a firearm by a felon, both offenses as a repeater. The following facts were established at Arrington's jury trial on those charges.

---

[1] All references to the Wisconsin Statues are to the 2019-20 version unless otherwise noted.

¶4 Before the homicide, Arrington and Rafeal Santana-Hermida (referred to as "Shorty") had a running feud concerning a robbery of Shorty's machine gun by Arrington and an assault on Arrington by Shorty. On the day of the homicide, Arrington drove from Milwaukee to Green Bay with a then-seventeen-year-old female, "Alicia,"[2] and Devin Landrum, so that Landrum could purchase marijuana. Arrington drove the car with Alicia in the front passenger seat and Landrum in the back seat. Arrington eventually parked across the street from a yellow house on Day Street. Gomez then came around the side of a neighboring house, and he was met by Shorty in the doorway of the yellow house. Alicia testified that Shorty and Arrington then exchanged words through the car window and that they seemed angry. Soon after Shorty and Arrington exchanged words, Arrington fired three or more gunshots from the driver's seat out the passenger window toward the house. One of Arrington's shots struck Gomez in the chest and killed him.

¶5 During the jury trial, there was no dispute that Arrington fired gunshots from the car toward the house where both Gomez and Shorty stood. Arrington argued he shot in self-defense, believing that Shorty was "acting very aggressive, very intimidating" and was reaching for a gun to shoot Arrington. Arrington also claimed that it looked as if Shorty accidentally shot Gomez when Shorty was coming around the door with a gun in his hand so as to return fire. A few days later, Arrington learned that the police were looking for him, and he surrendered himself to law enforcement.

---

[2] Pursuant to WIS. STAT. RULE 809.81(8), we use a pseudonym when referring to the juvenile witnesses.

¶6      While incarcerated at the Brown County Jail, Arrington was housed with Miller in a block referred to as "Fox Pod." Prior to Arrington's arrival at the jail, Miller's attorney notified the district attorney's office that Miller wanted to speak with law enforcement. Miller then began working as a confidential informant with detective Michael Wanta and his partner, detective Bradley Linzmeier, in an effort to obtain information from two other inmates, Donald Moore and Antwon Powell, regarding a homicide that did not involve Arrington. Linzmeier was also the lead detective in Arrington's case.

¶7      Before Arrington arrived at the Brown County Jail, Miller learned about Arrington's case from the news. After Arrington arrived at the jail, Miller informed the detectives that Arrington was talking about his case and that Miller believed Arrington would tell him things about the pending charges against him. Miller asked the detectives if he should record his conversations with Arrington, and the detectives told him that he could.[3] Wanta supplied the jail staff with a two-by-two-inch digital recorder that was tucked into a band around Miller's waist. Miller had the ability to turn the device on and off.

¶8      After Arrington was taken into custody, the complaint in his case had been filed, and Arrington had already made his initial appearance with counsel, Miller secretly recorded several conversations with Arrington. Law enforcement did not tell Miller what to discuss with Arrington, and he did not receive any specific consideration for this work. However, Wanta testified that when Miller made the recordings, he was seeking consideration in his pending cases in exchange for his

---

[3] Detective Linzmeier testified that when Miller asked "if he should record" any conversations with Arrington, he told Miller, "Yes." Detective Wanta testified that when Miller asked if he should record conversations with Arrington about his case, Wanta said "he could record conversations with Arrington."

work as a confidential informant and that Miller understood that the more helpful information an informant produces, the more consideration that informant may receive. Wanta and Linzmeier told Miller that the information he gathered would be "used as part of that consideration." After the recordings were made, Wanta would retrieve the recording device and transfer the contents to a CD that was placed into evidence. The recording device would then be returned to Miller for use the next day. Wanta also provided Linzmeier with copies of the CDs and briefed him on the recordings' contents.

¶9 In his trial testimony, Miller recounted the conversations he had with Arrington, which included Miller reviewing the criminal complaint with Arrington, advising Arrington about the State's evidence, and discussing Arrington's interactions with Shorty and the shooting itself. Excerpted portions of the recordings were then played for the jury.

¶10 In the first excerpted portion of the recording, Miller approached Arrington and asked if he wanted to read a magazine. When Arrington declined, the conversation turned to the subject of Shorty and the evidence against Arrington.

> [Miller]: Hey, my nigger, like you said, nigger the only motherfucker that seen this shit was the bitch Ricco, and Shorty. Shorty ain't gonna ice you. You think, you 100% for sure Ricco ain't gonna say nothing?
>
> Arrington: Yeah, he ain't gonna say shit. Damn.
>
> [Miller]: So the only person you gotta worry about is the bitch. You know what I'm saying? You think she's gonna come to court? You just gotta holler at your sisters and them holler at that bitch, dog.
>
> Arrington: Yeah, that's what I'm thinking ….

Miller clarified for the jury that he and Arrington were talking about convincing Alicia "not to come to court" in the case.

¶11     In the second excerpt, Miller and Arrington discussed both the shooting and an earlier incident in which Shorty was robbed of a gun. Miller testified that Arrington was making fun of Shorty during the robbery and that Arrington embarrassed Shorty. Arrington also told Miller that Shorty was "acting like a gorilla"—which Miller said meant "overly aggressive"—when Shorty saw Arrington in the car. Arrington told Miller that Shorty's behavior "added the fuel to the fire."

> [Miller]: And when you pulled up, was he acting like he was a beast?
>
> Arrington: Yeah. That's what added the fuel to the fire like when I seen him, I was gonna smash off but, dog, he just did the most.
>
> [Miller]: What'd he do?
>
> Arrington: Dog was acting like a gorilla.

¶12     In the third excerpt, Arrington told Miller that he "dumped the crib down"—which Miller stated meant that Arrington kept shooting at the house—and he did so because Shorty made a challenging gesture that reminded Arrington of previously being stabbed by Shorty.

> Arrington: It wasn't even that though. Nigger, when he was standing up there, nigger, you wanna know all that?
>
> [Miller]: What, he was talking shit?
>
> Arrington: Hey, what's up. All I could picture was this nigger stabbing me in my face. It wasn't even none of that, shit.
>
> [Miller]: Ah, he told you, he was like what's up?

6

Arrington: Yeah, I'm talking about, he like, nigger, open the door, right. He opened the door to greet his mans, and they, they laughing and joking and whatever. Then he looked down, directly down and see me. Man, what's up? I don't know what else he was saying but, nigger.

[Miller]: That's when you popped, knocked fire from their ass.

Arrington: I'm talking …

[Miller]: Hey, but see, it's fucked up because you ain't hit him. You hit the other nigger, you know what I'm saying?

Arrington: Right.

[Miller]: See you, boy, your aim ain't shit.

Arrington: It wasn't that he, he, like as soon as I, he ducked away, you mean.

[Miller]: Aw, he jumped?

Arrington: And I just dumped the crib down cuz I don't know if he gonna come back and dump me down, you mean, and then Ricco get into the car ....

[Miller]: Right.

Arrington: … I mean so he act ups on bro and the bitch, you mean.

[Miller]: Damn.

Arrington: I can't just smash off and leave my brother, you mean.

[Miller]: Right.

At no point in the recorded conversations did Arrington state that he saw Shorty with a gun or that Shorty had shot Gomez. Moreover, Miller also testified that Arrington did not tell him that he saw Shorty with a gun in his hand, that Shorty ever fired a gun, or that Shorty shot Gomez.

¶13    Ultimately, the State confirmed at trial that the State had provided Miller consideration in the form of a plea agreement for his work as a confidential informant, including for the information he obtained from the recordings with Arrington.  The agreement contemplated consideration for a "full debrief and testimony on Powell and Arrington."

¶14    Arrington was found guilty on both counts.  On the first-degree intentional homicide count, the circuit court imposed a life sentence, with eligibility for extended supervision after thirty-five years.  On the possession of a firearm count, the court imposed a concurrent sentence of three years' initial confinement followed by three years' extended supervision.

¶15    Arrington, represented by new counsel, filed a postconviction motion alleging that the State violated his right to counsel at trial when it used statements that its confidential informant had obtained in recorded conversations with Arrington after he had been charged and was represented by counsel.  Arrington argued that the introduction of those statements was plain error, entitling him to a new trial.  In the alternative, he sought a new trial, asserting that his attorney's failure to object to the statements at trial constituted ineffective assistance. Alternatively, Arrington sought a new trial in the interest of justice, all in relation to the use of the conversations between Miller and Arrington.

¶16    The circuit court held a ***Machner***[4] hearing, during which both Arrington and his trial attorney, Michael Hughes, testified.  Hughes testified he had the audio recordings "for quite some time" and had reviewed them before trial. Hughes was aware that Miller was acting as a confidential informant.  Hughes

---

[4] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

testified that he never considered whether the statements were obtained in violation of Arrington's right to counsel, and that he did not research the issue. Hughes testified that if he had identified that claim, he "likely would have" filed a motion seeking to suppress the statements that Miller obtained from Arrington. Arrington testified that he asked Hughes "if there was a way to keep [the recordings] out of evidence," and he believed Hughes replied that the recordings did not really matter because "he couldn't really hear much on 'em."

¶17     The circuit court denied the postconviction motion, concluding that Miller was not acting as an agent for the State when he recorded his conversations with Arrington. Therefore, the court concluded that Arrington's Sixth Amendment right to counsel was not violated and Hughes did not provide ineffective assistance by failing to object to the recordings. This appeal follows.

## DISCUSSION

*I. Sixth Amendment Right to Counsel*

¶18     We begin our analysis by deciding whether Arrington's Sixth Amendment right to counsel was violated when the State outfitted Miller with a recording device and authorized him to secretly record conversations with Arrington. In deciding whether a person is a government informant or agent for purposes of the Sixth Amendment, "the determination regarding the relationship or understanding between the police and the informant is a factual determination." *State v. Lewis*, 2010 WI App 52, ¶16, 324 Wis. 2d 536, 781 N.W.2d 730. However, "[o]nce these historical findings have been ascertained, it is a legal question whether the relationship or understanding found by the trial court is such that the informant's questioning has to be considered government interrogation." *Id.*

9

¶19    The circuit court provided several reasons for its conclusion that Arrington's Sixth Amendment right to counsel was not violated by the use of Miller's recordings and testimony regarding his conversations with Arrington. The court noted "[t]he State did not put … Miller and … Arrington together in Fox Pod. It was coincidence." Next, the court found that Miller's attorney approached the district attorney's office about Miller "voluntarily contributing information to the police[,] which prompted the police to have a discussion with him about being a confidential informant." Conversely, the police never approached Miller about recording Arrington.

¶20    The circuit court also observed that Miller "voluntarily asked the police if he should record any information from … Arrington, and the detective informed him that he could record such conversations." Citing *Lewis*, the circuit court concluded, "when a person offers to assist the police, we do not think the police must try to stop the person from providing assistance." *Id.*, ¶25. The circuit court further stated, "it is not the government's burden to protect a defendant from their own 'loose talk.'" *See United States v. Malik*, 680 F.2d 1162, 1165 (7th Cir. 1982). In the instant case, "Miller made requests to speak to law enforcement. Not vice versa."

¶21    The circuit court also noted that the police made no promises to Miller that he would receive a reduced sentence in exchange for the information he provided. The court further observed that Arrington began talking to Miller about his case without Miller prompting the conversation. Next, the court noted that the police were unable to listen directly to any of the conversations, and they did not tell Miller what questions to ask Arrington. Further, it was Arrington who volunteered information to Miller without being prompted by him. The court also found that Arrington was not the target of the investigation, which, to the court,

showed a lack of intent to make Miller a police agent. The court noted that "Miller voluntarily asked the police on his own initiative if he should record … Arrington, and he was under no obligation to do so."

¶22 The circuit court also observed that "the police did not even use the taped conversation of … Arrington until approximately one year had passed." And, "[o]ne would think if the recorded conversation by … Arrington was so important, the police would have listened right away no matter the circumstances. This lack of review goes to police intent." The court also reasoned that the use of the term "CI," meaning confidential informant, "does not indicate agency." Finally, the court stated the police had "no affirmative duty to keep … Miller away from … Arrington when they knew … Miller was assisting with another case." Again, the court emphasized that it is "not the government's job to protect defendants from their own 'loose talk.'"

¶23 In summary, the circuit court determined that Miller was not an agent of the State and, therefore, Arrington's right to counsel was not violated by Miller's voluntary actions in recording Arrington's statements. Rather, Miller "was acting on his own initiative and approached the police to help in Arrington's case." The court determined that while individually the points it made "might not be enough to show that … Miller was not an agent … all the points together certainly show that … Miller was not an agent."

¶24 The Supreme Court discussed the issue raised here in *Massiah v. United States*, 377 U.S. 201 (1964). In that case, a government agent deliberately elicited information about Massiah by allowing a co-defendant of Massiah to place a radio transmitter in the co-defendant's car. *Id.* at 202-03. At the time, Massiah was free on bond and had obtained legal representation. *Id.* at 202. A government

agent thereafter listened to a conversation involving Massiah from his vehicle parked down the street, during which Massiah made incriminating statements. *Id.* at 203. The Supreme Court concluded that Massiah was denied the basic protections of the Sixth Amendment because the federal agent had deliberately elicited incriminating statements from Massiah without his legal counsel's knowledge or consent. *Id.* at 206-07.

¶25 Three other Supreme Court decisions are relevant to a determination of whether the use of an informant to elicit incriminating statements violates a defendant's Sixth Amendment right to Counsel: *United States v. Henry*, 447 U.S. 264 (1980); *Maine v. Moulton*, 474 U.S. 159 (1985); and *Kuhlmann v. Wilson*, 477 U.S. 436 (1986) (abrogated on other grounds). In *Henry*, FBI agents reached out to Nichols, a paid informant, who was being held in the same jail cellblock as Henry. *Henry*, 447 U.S. at 266. The agents told Nichols to be alert to any statements made by the federal prisoner, but to not initiate any conversation with, or question, Henry. *Id.* Nichols subsequently engaged in conversation, while Henry was in custody and under indictment. *Id.* at 270. After Nichols' release from jail, one of the FBI agents contacted him, and Nichols gave the agent information that Henry had revealed to Nichols. *Id.* at 266. The government paid Nichols on a contingent fee basis—that is, he was paid only if the information he provided was useful—and Nichols testified at Henry's trial. *Id.* at 270. The Supreme Court held that the admission of Nichols' testimony violated Henry's Sixth Amendment right to counsel because law enforcement intentionally created a situation likely to induce Henry to make incriminating statements without the assistance of counsel. *Id.* at 274.

¶26 The Supreme Court reached a similar conclusion in *Moulton*. There, a co-defendant agreed to cooperate with law enforcement in return for a promise of there being no further charges filed against him. *Moulton*, 474 U.S. at 163. After

Moulton asked his co-defendant to meet and discuss the charges against them, the co-defendant agreed to law enforcement's request to have a recording device placed on his telephone and subsequently to wear a body wire for the meetings. *Id.* at 163-64. Moulton's statements to the co-defendant were admitted against him at trial. The Supreme Court stated that the "Sixth Amendment is not violated whenever— by luck or happenstance—the State obtains incriminating statements from the accused after right to counsel has attached." *Id.* at 176 (citing **Henry**, 447 U.S. at 276 (Powell, J., concurring)). In **Moulton**, however, the Court concluded that the State had deliberately elicited the statements by "knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.*

¶27 In **Kuhlmann**, detectives reached an agreement with Kuhlmann's cellmate to be an informant against Kuhlmann, and they instructed the cellmate not to ask Kuhlmann questions about the crime but merely to listen to what he said. **Kuhlmann**, 477 U.S. at 439. Unlike the other cases discussed above, the Supreme Court held that this arrangement did not violate the defendant's rights. The Court explained that the Sixth Amendment does not forbid "admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" *Id.* at 456 (quoting **Henry**, 447 U.S. at 271 n.9). Kuhlmann did not "demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459.

¶28 In **Lewis**, this court similarly addressed whether inculpatory statements made by a represented defendant to a jailhouse cellmate violated the defendant's Sixth Amendment right to counsel. **Lewis**, 324 Wis. 2d 536, ¶1. In **Lewis**, Gray had been a confidential informant for the federal government. *Id.*, ¶5.

13

Although Gray was not equipped with any recording device, he obtained information from his cellmate, Lewis. *Id.*, ¶4. After obtaining that information from Lewis, Gray disclosed to law enforcement officials, unprompted, the admissions Lewis had made to him. *Id.*, ¶¶5, 8. No law enforcement agency or officer had promised anything in exchange for the information he obtained. *Id.*, ¶9. Gray also testified that no one from law enforcement ever asked or directed him to have a conversation with Lewis, or to listen to or talk to him in any way. *Id.* The information Gray obtained was volunteered by Lewis without Gray's prompting. *Id.*, ¶10.

¶29 We held that Gray was not a law enforcement agent because he was never under the direction or control of the government, there was no evidence that he received instructions from the government about Lewis, and he was never a paid informant. *Id.*, ¶20. We also quoted from *United States v. Surridge*, 687 F.2d 250, 255 (8th Cir. 1982), in which the Eighth Circuit determined that police need not turn away an informant seeking to cooperate:

> [W]e do not think the police have a duty to bar visits with potential informants; indeed such a requirement would be unfair to prisoners. Also, when a person offers to assist the police, we do not think the police must try to stop the person from providing assistance. *As long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the [F]ifth or [S]ixth Amendments.*

*Lewis*, 324 Wis. 2d 536, ¶25 (quoting *Surridge*, 687 F.2d at 255; emphasis in *Lewis*). Discussing the quoted passage from *Surridge*, we stated that "[t]he italicized portion says it all and is the holding of this court." *Id.*

¶30 Additionally, we stated that "[l]aw enforcement is prohibited from using a surreptitious government agent (e.g., a fellow jail cellmate) to deliberately

14

elicit incriminatory statements, by investigatory techniques that are the equivalent of direct police interrogation, in the absence of counsel or a valid waiver of counsel." *Id.*, ¶1. We explained that avoiding this prohibition requires evidence "of some prior formal agreement—which may or may not be evidenced by a promise of consideration—plus evidence of control or instructions by law enforcement." *Id.*

¶31 Considering the foregoing authorities, the question here becomes whether Miller was acting as an agent of law enforcement and was acting under the direction or control of law enforcement when he recorded his conversations with Arrington. Arrington argues that we must reject the circuit court's conclusion that Miller was not an agent of the State because the facts as found by the court show a constitutional violation similar to those in *Massiah*, *Henry*, and *Moulton*. Conversely, the State argues that this case is like *Lewis* because there was no prior formal agreement between Miller and law enforcement and there was no evidence of police control or instructions, so it cannot be said that Arrington's right to counsel was violated.

¶32 We conclude that Miller was acting as an agent of the State during his recorded conversations with Arrington. We do so for the following reasons. Miller was a prior confidential informant. Although it was Miller who first approached law enforcement, Miller ultimately reached an agreement with police to secretly record conversations with identified inmates, including Arrington, who had been charged and were represented by counsel. Miller approached law enforcement before recording Arrington's conversations claiming that "Arrington was talking with [Miller] and he believed that … Arrington would tell him things about the case and he asked if he should record it." This fact distinguishes this case from *Lewis* because this was not a situation where Miller obtained information from Arrington and then approached law enforcement to hand over the information by

"happenstance." Rather, this attempt to gain information was planned between Miller and law enforcement in advance.

¶33 In addition, law enforcement outfitted Miller with a recording device in order to create recordings of information obtained from Arrington. Officers then planned to retrieve the recordings, preserve them as evidence, and then refit Miller with the recording device the next day. The record further shows that Miller initiated the conversation with Arrington on each occasion with the officers' full knowledge. Moreover, both Miller and law enforcement knew that Miller was attempting to obtain information on Arrington's case. Although Miller was not told what to say or ask, the detectives knew that Arrington would talk to Miller about his case, and they were interested in recording those conversations.

¶34 The circuit court also found that the detectives knew Miller was seeking consideration for his work. While it was not specified what the consideration would be, Wanta testified the detectives told Miller that "the information he would gather would … be used as part of his consideration." At Arrington's trial, the prosecutor called Miller as a witness, and he testified about Arrington's statements while portions of the recordings were played to the jury.

¶35 The conduct by the detectives here is the very conduct that is prohibited by the cases discussed above. Once the right to counsel has attached, "at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Moulton*, 474 U.S. at 171. That protection is not limited to formal police interrogations, but it also extends to "surreptitious interrogations," which include conversations secretly recorded by an individual cooperating with police. *Massiah*, 377 U.S. at 206.

16

¶36    What occurred here was the intentional, surreptitious creation of an opportunity to confront Arrington without counsel present. The detectives equipped Miller with a recording device and expressly authorized him to record his conversations with Arrington. These actions clearly show that an agency relationship was created. Further, the detectives' actions violated the Sixth Amendment because they created a situation likely to induce Arrington to make incriminating statements without his counsel's assistance. *See Henry*, 447 U.S. at 274. Law enforcement and Miller took action "beyond merely listening, that was designed to elicit incriminating" statements for use as evidence against Arrington. *See Kuhlmann*, 477 U.S. at 459.

¶37    The State incorrectly argues that there can be no prior formal agreement unless specific consideration to the informant is spelled out in advance. The court in *Lewis*, however, held that "some prior formal agreement … *may or may not* be evidenced by a promise of consideration." *Lewis*, 324 Wis. 2d 536, ¶1 (emphasis added). There is no need to have consideration at all, let alone consideration spelled out in advance. What matters is that law enforcement exhibited direction and control here, as the detectives knew what Miller would be doing and that he was seeking consideration for his efforts. The detectives knew Miller was seeking to provide incriminating statements regarding Arrington's case. They even controlled how Miller would obtain those statements from Arrington by outfitting Miller with a recording device to memorialize his conversations with Arrington. Miller was thus acting as an agent of the State and, in turn, the State violated Arrington's Sixth Amendment right to counsel by using the recorded conversations and Miller's testimony at Arrington's trial.

## II. Ineffective Assistance of Counsel

¶38     Given the violation of his Sixth Amendment right to counsel, Arrington next contends that his trial attorney, Hughes, was ineffective by failing to object to the admission of Miller's testimony and the associated recordings. To prevail on such a claim, one must show that: (1) his or her trial counsel's performance was deficient; and (2) that deficient performance prejudiced the defendant. *See **Strickland v. Washington***, 466 U.S. 668, 687 (1984).

¶39     To prove deficient performance, a defendant must show that his or her counsel's representation fell below an objective standard of reasonableness. ***Id.*** at 688. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ***Id.*** at 689. To prove prejudice, a defendant must show that but for counsel's "unprofessional errors," there is a reasonable probability that the result of the proceeding would have been different. ***Id.*** at 694; *see also **State v. Sholar***, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89. A reasonable probability is one sufficient to undermine confidence in the outcome. ***Id.*** If a defendant fails to prove one prong of the ineffective assistance analysis, a court need not consider the other prong. ***Strickland***, 466 U.S. at 697.

¶40     A claim of ineffective assistance of counsel is a mixed question of fact and law. ***State v. Carter***, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We will uphold the circuit court's findings of fact unless they are clearly erroneous. ***Id.*** The ultimate determination of whether counsel's assistance was ineffective is a question of law, which we review de novo. ***Id.***

*A. Deficient Performance*

¶41     The facts are clear concerning Hughes' failure to seek suppression or otherwise object to admission of the unlawfully obtained statements and his

18

explanation on this matter. Arrington argues that Hughes' failures deprived him of the effective assistance of counsel. We agree. Hughes did not have a strategic reason for failing to object to the confidential informant evidence. Even though Hughes testified at the *Machner* hearing that he had the recordings "for quite some time" and had reviewed them "long before trial," he did not move to suppress the statements nor did he object at trial to Miller's testimony. The record reflects that Hughes simply missed the issue. Counsel only argued that the recordings were of poor quality, "muddled garbage," consisting of "idle chitchat" that "[do not] change anything," and that the recordings were "not evidence of guilt" but "all chitchat." Counsel failed to consider that Miller could explain at trial what Arrington's words meant. He also failed to realize that the recordings and statements were made in violation of Arrington's Sixth Amendment right to counsel. When Arrington asked Hughes if there was a way to keep the recordings out of evidence, Hughes simply replied that the recordings did not really matter because "he couldn't really hear much on 'em." That decision was not a strategic one, much less a reasonably strategic one.

¶42 The State emphasizes that in his closing argument, Hughes told the jury the recordings were "muddled garbage" and actually helped Arrington's defense. However, Miller's testimonial explanations of the recordings overcame their poor sound quality. Moreover, we perceive nothing in Miller's testimony that was helpful to the defense. Rather, the jury heard through Miller's testimony that Arrington "dumped the crib down" because he was angry at Shorty. More importantly, the recordings—as well as Miller's testimony—offered nothing that supported Arrington's defense that it was Shorty, not Arrington, who shot Gomez. Hughes also acknowledged during the postconviction hearing that the recordings cast Arrington's positive demeanor on the witness stand in a different light due to

19

the "profanity" and lack of "appropriate English." Hughes described Arrington as "very animated" on the recordings.

¶43 At the postconviction hearing, Arrington testified that before trial, he did not want to testify, but he later changed his mind when Hughes told him it was in his best interest to testify in light of the recordings. The problem is, before trial, Hughes could not know whether Arrington would or should testify. If the recordings had been suppressed, Arrington likely would not have needed to testify because his version of the events, including his claimed self-defense, would have been admitted through Linzmeier's less-prejudicial testimony.

¶44 Miller's testimony and the recordings were decidedly not helpful to Arrington, and, as explained above, their admission constituted a clear violation of Arrington's Sixth Amendment right to counsel. Hughes' failure to seek suppression of the recording, or to object to Miller's testimony at trial, for no strategic reason, fell far below an objective standard of reasonableness. Arrington has therefore established that Hughes performed deficiently by failing to seek suppression of, or otherwise object to, the admission of the recordings and Miller's testimony.

*B. Prejudice*

¶45 We also conclude that Hughes' deficient performance prejudiced Arrington. Miller's testimony regarding Arrington's statements was almost unimpeachable evidence against Arrington because the State also had recordings of the statements. Given the recordings, Hughes had little ability to attack Miller's credibility. The only argument counsel made regarding the recordings was that they were of poor quality, which counsel should have anticipated could be overcome by Miller's testimony.

20

¶46    Additionally, the recordings and statements eliminated any self-defense argument that Arrington could make, which was the only defense he had at trial. Although the record reflects that Arrington fired shots from the car, the State relied on Arrington's statements to Miller to convince the jury that Shorty did not have a gun and did not shoot Gomez but, rather, Arrington fired the shots at Shorty in retaliation and hit Gomez instead. As discussed above, the recordings likely changed the jury's impression of Arrington and resulted in the need for Arrington to testify where he otherwise might not have.

¶47    The prosecutor conceded in the State's closing argument that "[s]cience in this case hasn't been able to prove anything really for sure." An officer testified that he found bullet holes on or near the porch at foot level or below, which confirmed Arrington's testimony that he fired toward the foot area of the porch. Additionally, an expert testified that although there was gunshot residue found on Gomez's jacket, she could not determine the distance from which the bullet that penetrated the jacket was fired. All in all, there was some evidence supporting Arrington's self-defense claim making counsel's failure to object to the admissibility of the recordings all the more prejudicial.

¶48    The issue is not whether Arrington would have been acquitted without the recordings but, rather, whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Sholar*, 381 Wis. 2d 560, ¶46 (stating that to prove prejudice, "a defendant need not prove the jury *would have* acquitted him, but he must prove there is a *reasonable probability* it would have, absent the error") (citations omitted). Absent the recordings and Miller's associated testimony, we conclude there would have been sufficient questions regarding whether Arrington was acting in self-defense so as to raise a reasonable doubt about

21

Arrington's guilt on the homicide charge. Hughes' deficient performance therefore prejudiced Arrington. Arrington, however, concedes that reversal is not warranted on his felon in possession of a firearm charge, based on either the Sixth Amendment or an ineffective assistance of counsel claim.

## CONCLUSION

¶49 In summary, we conclude that Arrington's Sixth Amendment right to counsel was violated when Miller recorded conversations he had while he and Arrington were incarcerated. Miller was acting as an agent of the State and his conversations with Arrington therefore constituted government interrogation after Arrington had retained counsel. Additionally, Hughes' decision not to seek suppression or otherwise object to the admission of the statements deprived Arrington of his constitutional right to the effective assistance of counsel. Accordingly, we reverse and remand the matter for a new trial on the homicide charge without the use of the recordings and Miller's testimony about the jailhouse conversations with Arrington.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings.