# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP2065-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Richard Michael Arrington, |
| | Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 398 Wis. 2d 198, 960 N.W.2d459
PDC No:2021 WI App 32 - Published

| | |
|---|---|
| OPINION FILED: | July 1, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 10, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Brown |
| JUDGE: | Timothy A. Hinkfuss |

JUSTICES:
ROGGENSACK, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Sara Lynn Shaeffer*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sara Lynn Shaeffer*.

For the defendant-appellant, there was a brief by *Suzanne L. Hagopian*, assistant state public defender. There was an oral argument by *Suzanne L. Hagopian*.

**2022 WI 53**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP2065-CR
(L.C. No. 2016CF516)

STATE OF WISCONSIN  :  IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent-Petitioner,

      v.

Richard Michael Arrington,

      Defendant-Appellant.

**FILED**

**JUL 1, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review the court of appeals'[1] decision reversing the circuit court's judgment of conviction of Richard Michael Arrington on the charge of first-degree intentional homicide with use of a dangerous weapon pursuant to Wis. Stat. § 940.01 (2019-20),[2] as well as being a

---

[1] State v. Arrington, 2021 WI App 32, 398 Wis. 2d 198, 960 N.W.2d 459.

[2] All subsequent references to the Wisconsin Statutes are to

felon in possession of a firearm under Wis. Stat. § 941.29.[3] On appeal, the State asks us to reverse the court of appeals, arguing that it did not violate Arrington's Sixth Amendment right to counsel when a jail inmate secretly recorded conversations with Arrington. The State further argues that defense counsel's failure to object to the admission of the recordings as evidence against Arrington was not deficient performance and did not prejudice him, so as to warrant a new trial for ineffective assistance of counsel.

¶2 We conclude that Arrington's Sixth Amendment right to counsel was not violated because the jail inmate, Jason Miller, was not acting as a State agent when he recorded his conversations with Arrington. Further, a new trial is not warranted because Arrington's counsel's performance was not deficient and Arrington was not prejudiced by his counsel's failure to object to the State's use of the recordings. Accordingly, we reverse the decision of the court of appeals and affirm the circuit court's judgment of the convictions.

I. BACKGROUND

¶3 Arrington's convictions stem from a shooting that occurred on April 2, 2016, and resulted in the death of Ricardo Gomez. The shooting itself was described as the culmination of

the 2019-20 version unless otherwise noted.

[3] The Honorable Timothy A. Hinkfuss of Brown County Circuit Court presided.

a weeks-long feud between Arrington and a third individual, Rafeal Santana-Hermida, also known as "Shorty."

¶4 The feud began a few weeks before the shooting when a "drug deal [went] bad" and Arrington robbed Shorty at gunpoint, stealing Shorty's machine gun. Shorty responded by attacking Arrington through a car window with a knife, cutting his lip. At trial, witnesses testified that, following Shorty's attack, Arrington threatened to "[expletive] Shorty up" and stated that he was going to "handle his business." Another witness testified that Arrington was "highly upset" and had been seen carrying a machine gun.

¶5 On the day of the shooting, Shorty and his girlfriend were at Craig Taylor's house. Taylor testified that he had seen Arrington in a car near his house and was worried that he wanted to kill Shorty. Arrington was circling the block in his car and looked "like he was hunting." Taylor further testified that Arrington "had that look in his eye like he wanted to kill something." A separate witness, Lawrence Hawkins, came and left Taylor's house prior to the shooting. Hawkins testified that when he left Taylor's house, he saw Arrington parked across the street. Arrington asked him if Shorty was inside and Hawkins responded that he did not know. When he walked away, Hawkins called Taylor and told him that Arrington was outside asking about Shorty.

¶6 In the moments immediately preceding the shooting, Ricardo Gomez arrived at Taylor's house. Gomez walked up to the front door and told Shorty, who was standing in the open

3

doorway, that someone was "outside looking for him." According to Taylor, Arrington began shooting into the doorway as soon as he saw Shorty. Taylor testified that he "was right there when the bullets hit [Gomez]" and that he saw Gomez fall onto Shorty after being hit. Taylor further asserted that he did not see Shorty with a gun and Shorty "never reached for [anything]."

¶7 Two other witnesses, AVT[4] and David Landrum, were in the car with Arrington on the day of the shooting. AVT, who was seated in the front passenger seat of the car, stated that Arrington rolled down her window and exchanged words with Shorty. Then Arrington started "shooting a gun right by [her] face." AVT testified that a "shell hit me in my head, and [Arrington] told me to shut up." She also never saw Shorty shooting at the car and explained that if Shorty had returned fire, she likely would have been hit in the process because she "was sitting right there." She asserted that "[t]here was no gun [that] came out [of] that house . . . ." This assertion was confirmed by a thorough police search of Taylor's house, the people in Taylor's house, and the neighborhood that revealed no firearms.

¶8 Following the shooting, AVT said she told Arrington that she wanted to get out of the car, and he responded, "you on a murder case with me now, you ain't going nowhere." She testified that Arrington threatened to kill her and her family

_____

[4] Pursuant to Wis. Stat. § (Rule) 809.81(8), we use a pseudonym when referring to the juvenile witnesses.

4

if she spoke to the police. He also told her to burn her clothes and clean the car that they used the day of the shooting. AVT stated that Arrington later approached her in a different car and ordered her to get in. He had a gun in his lap and was wearing a mask and latex gloves. He threw her phone out the window of the car and drove her around for the night while threatening to "ice her" if she left. She woke up alone in the car the next morning and ran.

¶9 Eugene and Erica Herrod testified that the night of the shooting, Arrington came to their home and used bleach to clean his hands, face, and hair. He told them that he had "popped" someone and asked Eugene for a ride to Milwaukee. Arrington told Eugene that he had "fanned Shorty down." However, upon later learning that he had killed the wrong person, Arrington told Eugene that he would come back and "get that [expletive] Shorty and finish my job." Arrington testified that after the shooting, he changed his hair and appearance to try to hide from law enforcement.

¶10 After Arrington turned himself in, he was charged and brought to Brown County jail. While he was in custody, and had already made his initial appearance with counsel, Arrington began having conversations with another inmate, Jason Miller. Miller used a recording device given to him by law enforcement, to record his conversations with Arrington. In these recordings, Arrington made incriminatory statements regarding his on-going feud with Shorty and his role in the shooting of Gomez.

5

¶11 Finally, almost a year after the shooting, Arrington requested an interview with Detective Brad Linzmeier. In this interview, Arrington suggested, for the first time, that his shooting was in self-defense. Regarding his earlier feud with Shorty, Arrington claimed to have nothing to do with the machine gun robbery and explained that he was seeking to give Shorty money as repayment for the robbery when Shorty stabbed him through the car window. On the day of the shooting, Arrington claimed that the only reason he began to shoot was because he saw Shorty reaching into his waistband. Even then, Arrington claimed to have fired only at the porch. Arrington said that Shorty, after ducking out of the way of Arrington's bullets, fired a single shot in response to Arrington and hit Gomez. Linzmeier testified that this was the first time that he heard about Shorty having a handgun and shooting Gomez.

¶12 The case proceeded to a jury trial, which lasted six days and saw a total of forty-two witnesses testify. At trial, the State introduced the recorded evidence that it received from Miller in addition to the statements of witnesses relayed above. Defense counsel acknowledged to the court that he had the recordings "for quite some time" and had reviewed them "long before trial." He told the court he had "no objection" to their admission. He did, however, object to providing a transcript to the jury, which objection was sustained.

¶13 Miller testified that, before he and Arrington began speaking, he had been helping law enforcement with an unrelated homicide investigation. Specifically Miller had been gathering

6

information on a defendant named Antwon Powell. Miller explained that Arrington was the one who began their conversations by asking him to read the criminal complaint against him and asking whether "there was enough there."

¶14 Miller testified that, following their initial conversation about the complaint, he and Arrington spoke about the events of the shooting at Taylor's house. Arrington told Miller that, upon seeing Shorty, all he could think about was Shorty stabbing him, and then he "just got to shooting." However, Arrington confessed that "when he got to shooting, Shorty jumped back, and when he jumped back, it hit [Gomez]." Miller also testified that, over the course of their conversations, Arrington never mentioned that he saw Shorty with a gun in his hand or that he saw Shorty shoot Gomez.

¶15 Later, Miller asked Arrington if Shorty was "acting like a beast?" And Arrington replied, "Yeah, that's what added fuel to the fire," and that Shorty was "acting like a gorilla." Miller told Arrington that his aim "ain't shit" because when he shot at Shorty, Arrington "hit the other [expletive]." Arrington replied that he "just dumped the crib down" because he did not know if Shorty would come back and retaliate.

¶16 Later in the trial, Arrington took the stand and denied feuding with Shorty. Arrington testified that he forgave Shorty following the stabbing and, contrary to other witness testimony, was not upset at Shorty. Similarly, Arrington explained that he was at Taylor's house the day of the shooting only because Landrum wanted to get some marijuana. When Shorty

7

saw Arrington, Shorty started "going crazy." Arrington testified that he thought he saw Shorty reach for a gun, but that he actually didn't see a gun. In response to this, Arrington fired three shots at the house. As he drove away, Arrington explained that, what he saw was "Shorty come around the door with the gun in his hand at the same time that [Gomez] . . . was coming into the house, and what it looked like to me was that Gomez had been shot by [Shorty]."

¶17 Following the shooting, Arrington denied doing anything that would incriminate him in Gomez's shooting, and he dismissed significant testimony to the contrary. For example, Arrington denied speaking with Erica Herrod and asking for bleach after "popping" someone. He denied having any contact with AVT following the shooting, let alone kidnapping her. He described AVT's testimony as "all lies." When asked why Eugene Herrod testified that Arrington told him that he "got the wrong guy but I'm going to come back and finish the job and get Shorty," Arrington replied, "I don't know why Eugene told you guys that." Arrington also agreed when the State asked him whether it "sound[ed] like a lot of people are making stuff up."

¶18 The jury convicted Arrington on both the first-degree intentional homicide and being a felon in possession of a firearm. After obtaining new counsel, Arrington moved for postconviction relief. He asserted that the State violated his Sixth Amendment right to counsel when it used Miller to obtain recorded conversations after he had been charged and was represented by counsel. Arrington argued that the introduction

8

of those statements was plain error, entitling him to a new trial. Alternatively, he sought a new trial, asserting that his attorney's failure to object to Miller's recordings at trial constituted ineffective assistance of counsel.

¶19 The circuit court held a Machner[5] hearing during which Arrington, his trial counsel, Michael Hughes, and Detectives Michael J. Wanta and Linzmeier testified. Hughes re-affirmed that he had the recordings for "quite some time" before trial and did not consider moving to suppress the recordings. The circuit court also heard testimony from the detectives regarding the origin of Miller's involvement in Arrington's case.

¶20 Wanta testified that Miller was assisting him on the Powell homicide case. Wanta testified that, in an April 6, 2016 meeting, Miller had expressed an interest in "recording conversations that he was having with the parties that we identified [in regards to the Powell case]. Wanta told Miller that the detectives would help "facilitate that. And the information he [gathered] would . . . be used as part of his consideration." This conversation occurred before Arrington had turned himself in on April 8, 2016. Accordingly, it had zero relationship to any investigation into Arrington because no investigation into Arrington existed at that time. Indeed, Wanta explained that he was not "aware of any possibility of

---

[5] See State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

Mr. Miller's speaking to Mr. Arrington during [the] April 6 meeting[.]"

¶21 Following Arrington's custody, Miller approached Wanta about recording Arrington. Wanta became aware of Miller's request to speak with law enforcement about Arrington when Miller's attorney contacted the District Attorney's office. The District Attorney's office passed the request onto Wanta, who met with Miller at the jail. Miller told Wanta that Arrington "was talking with him and he believed that Mr. Arrington would tell him things about the case and he asked if he should record it. I said he could record conversations with Mr. Arrington." The detectives also testified that they told Miller, "if you want to record the conversation you can." Miller was never instructed that he should record Arrington.

¶22 Wanta was aware that Miller was seeking consideration for gathering information on Arrington, but testified that he made it "very clear from the start" that he would "not get involved in specifics regarding consideration" because that "comes from the District Attorney." There was never an offer of consideration from law enforcement to Miller for information gathered on Arrington.[6] Wanta also explained that he did not

_____

[6] Any indication or inference that the April 6 discussion of consideration for information gathered in the Powell case was tantamount to an offer of consideration for information gathered on Arrington's case is factually incorrect and purposefully misleading. The police did not assure Miller that information he gathered on Arrington "would . . . be used as part of his consideration." Linzmeier and Wanta, as instructed by their standard practice and training, were straightforward and "very clear from the start" that they would not speak to Miller about

give any direction to Miller regarding the types of information he should record or what type of questions he should ask Arrington.

¶23 Wanta testified that law enforcement provided Miller with the recording device and that there was no way "to monitor it or listen to this particular device. It is a matter of basically flipping a switch on the side of it on and off." They could not listen "in live-time," and only Miller had the ability to turn the recorder on and off. Miller made the recording that was played at trial on April 13. There is no support in the record for any agreement between Wanta and Miller that Miller acted as the State's agent when he made that recording.

¶24 The postconviction court concluded that Miller was not acting as an agent for the State when he recorded his conversations with Arrington. Therefore, Arrington's Sixth Amendment right to counsel was not violated. In the course of its decision, the court made numerous findings of fact. First, the court found that the "State did not put Mr. Miller and Mr. Arrington together in Fox Pod. It was a coincidence." It also found that "[t]he police never approached Mr. Miller about

---

consideration or make promises of consideration to Miller for any information Miller provided on Arrington. No conversation regarding consideration for Miller's work on the Arrington case occurred. In the postconviction motion hearing, Wanta was asked whether "Mr. Miller ask[ed him] specifically for consideration in this case?" Wanta replied, "Not any specific consideration." Later Linzmeier was also asked if "[he] ever [spoke] to Mr. Miller about any consideration?" Linzmeier replied, "No, not specifics of anything."

11

recording Mr. Arrington." Rather, it was Miller's attorney that spoke to the District Attorney's office "about him voluntarily contributing information to the police" and that this was what prompted the police to "have a discussion with him" in the Arrington investigation.

¶25 Furthermore, "before making any recordings, Mr. Miller voluntarily asked the police if he should record any information from Mr. Arrington, and the detective informed him that he could record such conversations." And although the police were aware that Miller was seeking consideration for gathering information on Arrington from the District Attorney's office, "they made no promises to Mr. Miller that the fact that he was giving information would lead to a reduced sentence."

¶26 It was Miller who was "wearing a wire that he could turn on and off on his own initiative." Arrington began talking to Miller about his case "without Mr. Miller prompting the conversation" and law enforcement "could not listen in on any conversation, and had not told what questions Mr. Miller should ask Mr. Arrington." Law enforcement personnel have "no affirmative duty to keep Mr. Miller away from Mr. Arrington when they knew Mr. Miller was assisting with another case" and it is not their responsibility "to protect defendants from their own 'loose talk.'" The postconviction court closed by explaining that, although each of the facts on its own is likely insufficient to disprove agency, "all the points together certainly show that Mr. Miller was not an agent."

¶27 The postconviction court also concluded that there was no ineffective assistance of counsel based on its decision about the Sixth Amendment. It further found that the conversation between Arrington and Miller was not prejudicial or ineffective but "consistent with the defendant's version of events. The statements bolster[ed] defendant's self-defense claim."

¶28 The court of appeals reversed the circuit court and granted Arrington a new trial. The court concluded that the conduct of the detectives in equipping Miller with a recording device was prohibited by the United States Supreme Court and Wisconsin case law and that the State "violated Arrington's Sixth Amendment right to counsel when Miller made the recordings of conversations with Arrington while acting as an agent of the State." State v. Arrington, 2021 WI App 32, ¶2, 398 Wis. 2d 198, 960 N.W.2d 459.

¶29 To support this conclusion, the court of appeals noted that the detectives' decision to equip Miller with a recording device and expressly authorize him to surreptitiously record his conversations with Arrington clearly showed an agency relationship. Id., ¶36. Further, the detectives' actions "violated the Sixth Amendment because they created a situation likely to induce Arrington to make incriminating statements without his counsel's assistance." Id. (citing United States v. Henry, 447 U.S. 264, 274 (1980)).

¶30 After concluding that the detectives violated Arrington's Sixth Amendment right to counsel, the court of appeals also concluded that Arrington's trial counsel was

13

ineffective. It concluded that trial counsel's "failure to seek suppression of the recording, or to object to Miller's testimony at trial, for no strategic reason, fell far below an objective standard of reasonableness." Arrington, 398 Wis. 2d 198, ¶44. It also concluded that, had the tapes not been admitted into evidence, "there would have been sufficient questions regarding whether Arrington was acting in self-defense so as to raise a reasonable doubt about Arrington's guilt on the homicide charge." Id., ¶48.

¶31 Accordingly, the court of appeals reversed and remanded the matter for a new trial on the homicide charge without the use of the recordings and Miller's testimony about his jailhouse conversations with Arrington.[7] We granted the State's petition for review, and now reverse the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶32 Arrington asks us to review the State's admission of Miller's recordings at trial under the plain error doctrine or, alternatively, for a determination that he received ineffective assistance of counsel. Under the doctrine of plain error, an appellate court may review error that was otherwise waived by a party's failure to object properly or preserve the error for

---

[7] Arrington conceded that, regardless of the violation of his Sixth Amendment rights or his counsel's deficient performance, reversal of his felon in possession of a firearm charge was not warranted. Arrington, 398 Wis. 2d 198, ¶48.

14

review as a matter of right. State v. Mayo, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115. We do not remedy errors under the plain error doctrine unless they are "obvious and substantial[,]" and "so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." State v. Bell, 2018 WI 28, ¶8, 380 Wis. 2d 616, 909 N.W.2d 750 (quoting State v. Jorgensen, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77).

¶33 The "plain error" that Arrington asserts is a violation of his Sixth Amendment right to counsel, which "involves the application of constitutional principles to historical facts." State v. Forbush, 2011 WI 25, ¶10, 332 Wis. 2d 620, 796 N.W.2d 741 (quoting State v. Hoppe, 2003 WI 43, ¶34, 261 Wis. 2d 294, 661 N.W.2d 407). We have adopted a two-part standard of review for questions of constitutional fact. Forbush, 332 Wis. 2d 620, ¶10. We uphold the circuit court's findings of historical or evidentiary fact unless they are clearly erroneous. State v. Arias, 2008 WI 84, ¶12, 311 Wis. 2d 358, 752 N.W.2d 748. We then independently review the application of constitutional principles to the facts found. State v. Ward, 2009 WI 60, ¶17, 318 Wis. 2d 301, 767 N.W.2d 236. In addition, we independently review as a question of law whether the undisputed facts establish an agency relationship. Lang v. Lions Club of Cudahy Wis., Inc., 2020 WI 25, ¶20, 390 Wis. 2d 627, 939 N.W.2d 582.

¶34 Furthermore, a claim of ineffective assistance of counsel presents a mixed question of law and fact. State v.

15

_Carter_, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695. We will uphold the circuit court's findings of fact unless they are clearly erroneous. _Id._ Findings of fact include the circumstances of the case and counsel's conduct and strategy. _Id._ (citing _State v. Thiel_, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305). Whether counsel's performance satisfies the constitutional standard for effective assistance of counsel is a question of law, which we independently review. _Carter_, 324 Wis. 2d 640, ¶19.

### B. Sixth Amendment

¶35 The Sixth Amendment of the United States Constitution guarantees that "the accused shall enjoy . . . the Assistance of Counsel for his defense."[8] Article I, Section 7 of the Wisconsin Constitution similarly guarantees that "[i]n all criminal

---

[8] In full, the Sixth Amendment of the United States Constitution reads:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

The Supreme Court applied the Sixth Amendment right to counsel to the states through incorporation by the Due Process Clause of the Fourteenth Amendment in _Gideon v. Wainwright_, 372 U.S. 335 (1963).

prosecutions the accused shall enjoy the right to be heard by himself and counsel."[9]  Generally, "the right to counsel under the Sixth Amendment [of the United States Constitution] and Article I, Section 7 [of the Wisconsin Constitution] 'attaches only at or after the time that adversary judicial proceedings have been initiated against [a defendant].'"  Forbush, 332 Wis. 2d 620, ¶15 (quoting United States v. Gouveia, 467 U.S. 180, 187 (1984)); see also State v. Sanchez, 201 Wis. 2d 219, 226, 548 N.W.2d 69 (1996) (concluding that the Article I, Section 7 of the Wisconsin Constitution right to counsel does not create a right different from the Sixth Amendment right to counsel).

### 1.  Historical facts

¶36 In concluding that Miller was not acting as a government agent at the time of the recordings, the postconviction court made several relevant findings of fact.

---

[9] In full, Article I, Section 7 of the Wisconsin Constitution, "Rights of accused," reads:

> In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

Wis. Const. art. I, § 7.

17

Initially, it found that Arrington was not the target of law enforcement's initial investigation and that it was a coincidence that Miller and Arrington ended up being in the same facility. It also found that Arrington was the person who prompted the initial conversation between him and Miller. It was after that initial conversation that Miller, through his attorney, approached law enforcement about voluntarily contributing information by recording Arrington. This offer was what prompted law enforcement to consider using Miller in Arrington's investigation.

¶37 Furthermore, the court found that Miller was under no obligation to record the conversations. The detectives told Miller that "he could record such conversations." The detectives did not tell Miller what questions to ask Arrington and the detectives could not listen in on any conversations. Miller wore a recording device "that he could turn on and off on his own initiative."

¶38 And although the detectives were aware that Miller was seeking consideration for gathering information on Arrington from the District Attorney's office, "they made no promises to Mr. Miller that the fact that he was giving information would lead to a reduced sentence." The circuit court found that "Miller was acting with the hope that the prosecutors in his case would give him a more lenient sentence[.]"

¶39 The postconviction court held a hearing during which it heard testimony from the detectives and Arrington regarding both parties' dealings and interactions with Miller. Upon

18

review of the record, we conclude that the factual findings of the postconviction court are supported by the record and are, therefore, not clearly erroneous.

## 2. Constitutional principles

¶40 Once the right to counsel has attached and been asserted, the State must honor it. Maine v. Moulton, 474 U.S. 159, 170 (1985). In a seminal Sixth Amendment case, Massiah v. United States, the United States Supreme Court established that the Sixth Amendment prohibits the government from deliberately eliciting incriminating statements from a defendant, in the absence of counsel, after the defendant has been indicted. Massiah v. United States, 377 U.S. 201, 206 (1964).

¶41 In United States v. Henry, the FBI sought information on a suspected bank robber, Henry, and reached an agreement with Henry's cellmate, Nichols, to be a paid informant. Henry, 447 U.S. at 266. The FBI told Nichols to "be alert to any statements" made by Henry, but not to initiate any conversation with or question Henry regarding the bank robbery. Id. The arrangement between Nichols and the FBI was on a "contingent-fee basis; Nichols was to be paid only if he produced useful information." Id. at 270. Nichols was later released from prison and was paid for the information he provided. Id. at 266.

¶42 In determining whether Nichols "deliberately elicited" incriminating statements, the United States Supreme Court concluded that three factors were important. Id. at 270. First, "Nichols was acting under instructions as a paid

19

informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols." Id. These factors, when combined, "intentionally creat[ed] a situation likely to induce Henry to make incriminating statements without the assistance of counsel, [and therefore,] violated Henry's Sixth Amendment right to counsel." Id. at 274.

¶43 In Moulton, the United States Supreme Court concluded that law enforcement violated the defendant's rights when it arranged to record conversations between the defendant and its informant, Colson. Moulton, 474 U.S. at 176. As part of his arrangement with police, Colson agreed that, in exchange for "no further charges [being] brought against him[,]" he would "testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges." Id. at 163.

¶44 The police had Colson record his phone conversations with the defendant, and then after learning from these phone recordings that Colson planned to meet with the defendant in-person, told Colson to wear a recording device to the meeting. Id. at 164-66. At the meeting, Colson actively questioned the defendant about facts and dates of the crime, in response to which the defendant made incriminating statements. Id. at 165-66. These statements then were used at the defendant's trial that resulted in a conviction. Id. at 177. The Court held that the State had deliberately elicited the statements by "knowingly circumventing the accused's right to have counsel present in a

20

confrontation between the accused and a state agent." Id. at 176.

¶45 In Kuhlmann v. Wilson, 477 U.S. 436, 439 (1986), detectives reached an agreement with the defendant's cellmate to be an informant. The detectives told the cellmate not to ask questions, but rather to simply "keep his ears open" to what the defendant said. Id. The defendant made incriminating statements which the informant reported to police. Id. The United States Supreme Court held that the Sixth Amendment does not forbid "admission in evidence of an accused's statements to a jailhouse informant who was 'placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" Id. at 456 (quoting Henry, 447 U.S. at 271 n.9). The Court concluded that the defendant in Kuhlmann did not "demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann, 477 U.S. at 459.

¶46 From these cases, courts have determined that in order to find a Sixth Amendment violation, "the statements in question must have been (1) deliberately elicited (2) by a government agent." United States v. Li, 55 F.3d 325, 328 (7th Cir. 1995). Here, there is no dispute that Miller deliberately elicited information from Arrington.[10] Therefore, we turn next to the second prong of the Sixth Amendment analysis, whether Miller was

---

[10] Miller had conversations with Arrington about his case, recorded those conversations, and gave the recordings to law enforcement for use in Arrington's trial.

21

acting as a government agent when he recorded his conversations with Arrington. We conclude that he was not.

¶47 Initially, a brief review of general agency principles will be helpful to our discussion.[11] We note that "a person or business acting on behalf of another, and subject to control of another, is an agent and the person or business they are acting on behalf of, a principal." Lang, 390 Wis. 2d 627, ¶25.

¶48 An agency relationship is based on an agreement between the principal and agent that expresses three elements: "(1) the conduct of the principal showing that the agent is to act for him or her; (2) the conduct of the agent showing that he or she accepts the undertaking; and (3) the understanding of the parties that the principal is to control the undertaking." City of Milwaukee v. NL Indus., 2008 WI App 181, 315 Wis. 2d 443, 485, 762 N.W.2d 757 (quoting Wis JI—Civil 4000). At times, the existence of an agency relationship "is a question of fact because the determination turns on 'the understanding between the alleged principal and agent.'" Lang, 390 Wis. 2d 627, ¶20 (citing Soczka v. Rechner, 73 Wis. 2d 157, 163, 242 N.W.2d 910 (1976)).

¶49 "The agent's duty is to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests." Losee v. Marine

---

[11] Although we acknowledge that, in prior Sixth Amendment "state agent" precedents, the United States Supreme Court has used a more specific, nuanced analysis to determine agency status, we include this discussion of common law agency principles for a fuller understanding of the concept as a whole.

Bank, 2005 WI App 184, ¶16, 286 Wis. 2d 438, 703 N.W.2d 751. Generally, an agent has the duty to obey all reasonable directions as to its manner of performing the service it has agreed to perform. See Restatement (Second) of Agency § 385 (1958). "What matters in forming an agency relationship is that the principal has the right to control that conduct." Lang, 390 Wis. 2d 627, ¶30.

¶50 In the specific context of examining the work of a government informant for purposes of an alleged Sixth Amendment violation, federal courts have determined that "there is no [Sixth Amendment] infringement unless the informant was a government agent, and there is no agency absent the government's agreement to reward the informant for his services." United States v. York, 933 F.2d 1343, 1357 (7th Cir. 1991), overruled on other grounds by Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999); see also Henry, 447 U.S. 26 at 270. In York, an inmate, Beaman, reported to FBI that his cellmate, York, had confessed to murdering his wife. York, 933 F.2d at 1355. Beaman had been acting as a prison informant for the FBI for years prior, but the FBI did not purposefully place him in the same cell as York to gather information. Id. at 1356. The FBI learned of York only when Beaman came to them with York's confessions. Id.

¶51 After Beaman reported the confessions, the FBI told him that they wanted him to gather more information on specific crimes: murder, official corruption, and drug offenses. Id. The FBI also conceded that there was an agreement with Beaman to assist his parole application by detailing the extent of his

23

cooperation with the government on York's case. Id. at 1358. The Court concluded that, as a matter of law, Beaman had acted as an agent on behalf of the government. Id. It concluded that the relevant question was whether the FBI "told Beaman to collect information" and specifically noted that FBI agent Stoll "told Beaman the type of information he was interested in receiving; that statement was tantamount to an invitation to Beaman to go out and look for that type of information." Id.

¶52 The Court further explained that, in deciphering whether an agreement between law enforcement and an inmate is formed, "[w]e must not confuse speculation about [an informant's] motives for assisting the police for evidence that the police promised [the informant] consideration for his help or, otherwise, bargained for his active assistance." Id. at 1357 (quoting Lightbourne v. Dugger, 829 F.2d 1012, 1021 (11th Cir. 1987), cert. denied, 488 U.S. 934, 109 S. Ct. 329 (1988)). Undoubtedly, "most inmates who provide information to law enforcement officials harbor the hope that their service will not go unrewarded[;]" however, just because "inmates realize there is a market for information about crime does not make each inmate who enters the market a government agent." Id. "[T]here is no agency absent the government's agreement to reward the informant for his services." Id.

¶53 Furthermore, federal courts have also concluded that agency status is particularized to specific defendants. "[A]n informant becomes a government agent for purposes of [Massiah] only when the informant has been instructed by the police to get

24

information about the particular defendant." Moore v. United States, 178 F.3d 994, 999 (8th Cir. 1999) (quoting United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997)). In Moore, the defendant, Moore, had been arrested for bank robbery and placed in jail awaiting trial. Moore, 178 F.3d at 997. At trial, Hartwig, a prisoner housed in the same cellblock with Moore, testified for the government as to conversations he overheard while in jail, in which Moore admitted his crimes. Id.

¶54 Importantly, during the same timeframe that Moore was admitting to his crimes in jail, Hartwig had received and signed a letter from the United States Attorney Office agreeing to "provide an informal proffer of information concerning his knowledge of drug-related criminal activity." Id. at 999. "The stated purpose of the meeting was to assist the government 'in determining what, if any, consideration should be afforded [Hartwig] in exchange for [his] agreement to provide information or other cooperation[.]'" Id. Hartwig revealed his information regarding Moore's admissions in his next statement to law enforcement, as required under the proffer agreement.[12] Moore argued that Hartwig was a government agent and, therefore, his

---

[12] "A proffer agreement is an agreement between a defendant and the government in a criminal case that sets forth the terms under which the defendant will provide information to the government during an interview, commonly referred to as a 'proffer session.'" Robert I. Smith, III, Fair Play and Criminal Justice: Drafting Proffer Agreements in Light of Total Waiver of Rule 410, 66 S.C. L. Rev. 809, 812 (2015) (quoting 1 Stephen E. Arthur & Robert S. Hunter, Federal Trial Handbook: Criminal § 31:3 (4th ed. 2014)).

25

testimony regarding the jailhouse admissions ran afoul of his Sixth Amendment rights.

¶55 The Court disagreed and reaffirmed that an informant becomes a government agent only when law enforcement instructs the informant to gather information on a particular defendant. Id. "To the extent there was agreement between Hartwig and the government, there is no evidence to suggest it had anything to do with Moore." Id. Rather, the proffer served as evidence that Hartwig was willing to disclose pertinent criminal activity in hopes of receiving a more favorable plea agreement. Id. In rejecting Moore's Sixth Amendment claim, the court concluded that "the link between Hartwig's relationship with the government and his conduct at issue" was insufficient to be considered a Massiah violation against Moore. Id. at 999–1000.

¶56 The Eighth Circuit doubled down on this particularized agency analysis in United States v. Johnson, 338 F.3d 918, 921 (8th Cir. 2003) ("There is nothing obscure about this language. . . . we said that an informant becomes a government agent for Massiah purposes only when the informant has been instructed by the police to get information about a particular defendant.") (emphasis in original). The district court in Johnson concluded that agency was established, even in the "absence of express instructions from the government to get information about a particular defendant[,] 'by proof of an implicit agreement arising from a longstanding informant's . . . "symbiotic relationship"' with the government." Id. at 922.

26

¶57 The Eighth Circuit rejected this analysis and, instead, described Moore as a "bright-line rule[:] If an informant has not been instructed by the police to get information about the particular defendant, that informant is not a government agent for Massiah purposes." Id. The Court concluded that Moore's language could not be "explained away." Id.

¶58 Likewise, the Wisconsin Court of Appeals concluded that both (1) proof of an agreement between law enforcement and the informant and (2) law enforcement control over the investigation are necessary to a conclusion that the informant was a state agent. State v. Lewis, 2010 WI App 52, ¶¶21-25, 324 Wis. 2d 536, 781 N.W.2d 730. In Lewis, an inmate, Gray, approached police with information on his cellmate, Lewis, who was awaiting trial on robbery charges. Id., ¶4. Law enforcement had not placed Gray in the cell with Lewis and had no knowledge of Gray until he approached them with information. Id., ¶8. Gray testified that Lewis volunteered the information without prompting, id., ¶10, and "admitted that no law enforcement agency or officer ever promised anything to him in exchange for him providing information." Id., ¶9. He said he came forward "in the hope that the government would take his willingness to inform into account." Id. The circuit court found that it was a "unilateral decision by Gray to volunteer this information." Id., ¶15.

¶59 After being convicted, Lewis filed a postconviction motion arguing that Gray's testimony violated his Sixth

27

Amendment right to counsel. Id., ¶7. Regarding Gray's status as a government agent, Lewis argued that if the government creates circumstances "whereby a person predisposed toward giving information in the hope of a possible reward is in a jailhouse setting, . . . that predisposed person is an agent when information is retrieved, agreement or no agreement, control or no control." Id., ¶21. The court of appeals disagreed and concluded that there was no agreement between law enforcement and Gray. Id., ¶23. The court explained that "the key issue is the extent of government involvement. When the government pays the informant, it is evidence (although not conclusive) that a prior agreement between the government and the informant existed, whether that agreement was explicit or implicit." Id., ¶22 (quoting United States v. Surridge, 687 F.2d 250, 254 (8th Cir. 1982)). "The fact that the government might know an informant 'hopes' to receive a benefit as a result of providing information does not translate into an implicit agreement[.]" Lewis, 324 Wis. 2d 536, ¶23.

¶60 The court refused to "extend the rule of Massiah and Henry to situations where an individual, acting on his [or her] own initiative, deliberately elicits incriminating information." Id. (quoting United States v. Malik, 680 F.2d 1162, 1165 (7th Cir. 1982)). It held that "[a]s long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the . . . [S]ixth Amendment[]." Lewis, 324 Wis. 2d 536, ¶25 (quoting Surridge, 687 F.2d at 255).

28

¶61 Here, the circuit court found that Miller voluntarily came to law enforcement and asked whether he could record his conversations with Arrington. Rather than directing Miller to speak with Arrington, the detectives simply told Miller, "if you want to record the conversation you can." Like the informant in Lewis, Miller made a unilateral decision to volunteer his information to law enforcement. Miller acted on his own initiative.

¶62 Additionally, Miller was not paid or promised payment by the detectives for gathering information on Arrington. Although not conclusive, payment is evidence of an agreement between law enforcement and an informant. In Henry, one of the Supreme Court's factors for determining that an inmate was a government agent was that he was a paid informant. See Henry, 447 U.S. at 270 ("First, Nichols was acting under instructions as a paid informant for the Government[.]"). See also Moulton, 474 U.S. at 163 (describing Colson's agreement to testify against defendant and cooperate in police investigation in exchange for no further charges); York, 933 F.2d at 1359 (describing agreement with FBI to assist Beaman's parole application by detailing his cooperation in York case). Conversely, in Lewis, the court of appeals concluded that an informant's "hope" that his services would be rewarded was not enough to form the basis of an implicit agency agreement. Something more is needed.

¶63 Here, the detectives were very clear to make no promises to Miller regarding consideration for gathering

29

information on Arrington. They told Miller that any payment or consideration would come from the District Attorney's office. On this basis, the circuit court found that "Miller was acting with the hope that the prosecutors in his case would give him a more lenient sentence[.]" As with the court's conclusion in Lewis, we similarly refuse to extend the application of Sixth Amendment to instances where an individual is acting on his own initiative to deliberately elicit information in the hope of receiving consideration. Miller's decision to entrepreneurially enter the information marketplace did not transform him into a government agent. For Miller to be a government agent, there must have been a prior agreement with the government. Whether there was a promise of consideration is strong evidence of whether there was a prior agreement. No consideration was ever promised to Miller for gathering information on Arrington.

¶64 Moreover, to the extent that Miller had an agreement regarding consideration for information he gathered on the Powell case, there is no evidence to suggest that it had anything to do with Arrington. Moore, 178 F.3d at 999 (setting out particularized agency determination); Johnson, 338 F.3d at 922 (describing Moore's particularized agency analysis as a "bright-line rule"). The alleged agreement and the statement that the information he gathered "would . . . be used as part of his consideration" was particularized and concerned only the Powell case. Furthermore, the statement occurred before Arrington was in police custody; and therefore, it occurred before Miller had the opportunity to talk with Arrington.

30

¶65 As the court in Moore explained, even the close timeframe is not enough to impute an agreement regarding information gathered on one case as an agreement regarding information gathered on a separate case. See Moore, 178 F.3d at 999 (explaining that Moore was arrested and taken to jail on February 20, 1998, and Hartwig had signed his proffer agreement with law enforcement "[s]ometime between February 17 and February 25, 1998"). Miller's readiness to gather information on Powell in exchange for consideration showed nothing more than his willingness to enter the informational market. Accordingly, we conclude that there was no agency agreement between Miller and the State for gathering information on Arrington.

¶66 The Lewis court similarly concluded that an element of the agency analysis is whether law enforcement have control of the questioning. It is a bedrock principle of agency law in Wisconsin that "the principal has the right to control [the agent's] conduct." Lang, 390 Wis. 2d 627, ¶30. Applying this principle in a Sixth Amendment context, the court in Lewis held that "[a]s long as the police do nothing to direct or control or involve themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the . . . [S]ixth Amendment[]." Lewis, 324 Wis. 2d 536, ¶25 (quoting Surridge, 687 F.2d at 255). Law enforcement personnel have no duty to protect defendants from their own "loose talk." Lewis, 324 Wis. 2d 536, ¶24 (citing Malik, 680 F.2d at 1165).

¶67 Likewise, the United States Supreme Court has concluded that the level of government involvement and control

31

of questioning are relevant to whether an agency relationship exists. Compare Moulton, 474 U.S. at 176-77 (finding Sixth Amendment violation when a wired informant actively questioned defendant on details of a crime at request of police) with Kuhlmann, 477 U.S. at 439 (finding no Sixth Amendment violation when informant was told by police to just "keep his ears open" to what the defendant said).

¶68 Here, the detectives did not direct or control Miller's questioning of Arrington. Unlike the FBI agent in York, who told Beaman which crimes to question York on, the detectives never gave Miller any direction to speak with Arrington, question Arrington, or ask Arrington follow-up questions. The circuit court found that they did not tell Miller which questions to ask Arrington or what information to gather. Miller was under "no obligation" to record his conversations with Arrington. Furthermore, when Miller did choose to record, he was in control of what was recorded. Miller wore a recording device "that he could turn on and off on his own initiative." The detectives could not listen into the conversations in real-time. They did not control Miller's recording or questioning.

¶69 The detectives also had no affirmative duty to protect Arrington from Miller. If a defendant prompts conversations with another inmate, he puts himself at risk. Law enforcement has no duty to protect him from his own decisions regarding with whom he chooses to converse. Similarly, the mere act of providing Miller with a recording device is not enough to

32

constitute control of his questioning. The recording device in this case was nothing more than an avenue for the police to place a "listening ear" into Arrington's cell. See Kuhlmann, 477 U.S. at 461 (Burger, C.J., concurring). By itself, this act did not elicit information from Arrington and did not violate his Sixth Amendment rights.

¶70 Accordingly, because the detectives did not have an agreement with Miller or control his questioning, we conclude that there was no agency relationship between Miller and law enforcement and no violation of Arrington's Sixth Amendment right to counsel. Consequently, having determined that there was no Sixth Amendment violation, Arrington has not identified an error to which we may apply the plain error doctrine. This necessarily means that we need not consider whether, if the recordings had been improper, the impropriety "would have been so obvious, substantial, and fundamental that it would necessitate a new trial[.]" Bell, 380 Wis. 2d 616, ¶59.

C. Ineffective Assistance of Counsel

¶71 "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." State v. Lemberger, 2017 WI 39, ¶16, 374 Wis. 2d 617, 893 N.W.2d 232 (quoting State v. Balliette, 2011 WI 79, ¶21, 336 Wis. 2d 358, 805 N.W.2d 334). The right to effective assistance of counsel also is provided under Article I, Section 7 of the Wisconsin Constitution. Lemberger, 374 Wis. 2d 617, ¶16. That counsel's assistance was ineffective, may be demonstrated by establishing

33

that counsel's performance was deficient and that the deficient performance was prejudicial. State v. Breitzman, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). Courts need not address both deficient performance and prejudice if the ineffective assistance of counsel claim can be resolved either way. See id. at 697.

¶72 To establish that an attorney's performance was deficient, the defendant must prove that "counsel's performance fell below an objective standard of reasonableness." State v. Maday, 2017 WI 28, ¶54, 374 Wis. 2d 164, 892 N.W.2d 611. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. See also State v. Maloney, 2005 WI 74, ¶25, 281 Wis. 2d 595, 698 N.W.2d 583 ("Judicial scrutiny of an attorney's performance is highly deferential."). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

¶73 Because we conclude that there was no Sixth Amendment violation, it is necessarily true that Arrington's counsel was not deficient in failing to object to the admission of the recordings. See State v. Johnson, 2004 WI 94, ¶24, 273 Wis. 2d 626, 681 N.W.2d 901. Moreover, even if the law on this area were unsettled, which it is not, "ineffective assistance of

34

counsel cases [are] limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue." Maloney, 281 Wis. 2d 595, ¶29 (quoting State v. McMahon, 186 Wis. 2d 68, 85, 519 N.W.2d 621 (Ct. App. 1994)). "[I]t is axiomatic that '[c]ounsel is not required to object and argue a point of law that is unsettled.'" Maday, 374 Wis. 2d 164, ¶55. Consequently, we conclude that counsel's performance was not deficient and, therefore, Arrington was not denied effective assistance of counsel.

¶74 Although we need not address prejudice to conclude that Arrington was not denied effective assistance of counsel, see Strickland, 466 U.S. at 689, we choose to do so in this case. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." State v. Domke, 2011 WI 95, ¶54, 337 Wis. 2d 268, 805 N.W.2d 364 (citing Strickland, 466 U.S. at 694). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Domke, 337 Wis. 2d 268, ¶54. "It is not sufficient for the defendant to show that his counsel's errors 'had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Carter, 324 Wis. 2d 640, ¶37). We examine the totality of the circumstances to determine whether counsel's errors, in the context of the entire case,

35

deprived the defendant a fair trial. Domke, 337 Wis. 2d 268, ¶54 (citing Thiel, 264 Wis. 2d 571, ¶¶62-63).

¶75 Arrington argues that he was prejudiced by the recordings because they "eviscerated" his claim of self-defense.[13] In the tapes, Arrington did not discuss Shorty having a gun or that it was actually Shorty who shot Gomez, both of which were crucial to his theory of the case. Conversely, the State argues that Miller's recordings were cumulative evidence piled on top of an already substantial amount of evidence of guilt. The State presented numerous witnesses who testified to Arrington's actions before, during, and after the shooting. Each of these witnesses undermined Arrington's own testimony regarding the shooting. Based on our review of the totality of the evidence, we agree with the State and conclude that there is not a reasonable probability that, but for the introduction of the recordings, the result of the proceeding would have been different.

¶76 A total of forty-two witnesses testified at trial. The jury heard testimony concerning the existing, violent feud between Shorty and Arrington, as well as Arrington's pledge to "[expletive] Shorty up" and "handle his business" prior to the shooting. This testimony supported the State's case against Arrington, specifically supplying a motive for why Arrington would shoot at Shorty. The jury also heard testimony that Arrington had the opportunity to commit this shooting, notably

---

[13] Def. Appellant's Br. at 35.

that Arrington was seen circling the block the day of the shooting and "had that look in his eye like he wanted to kill something." Additional witnesses testified that Arrington opened fire on Taylor's house and that Shorty did not return fire or have a gun. This testimony was further corroborated by the results of the police search that found no firearms at the scene or in Taylor's house.

¶77 Finally, there was also testimony that Arrington tried to silence witnesses and evade capture in the aftermath of the shooting. AVT, who was in the car with Arrington during the shooting, testified that Arrington found her at a gas station in Milwaukee, threatened her with a gun, kidnapped her, and then stranded her in a car the next morning. Erica Herrod testified that, after the shooting, Arrington asked her for bleach to clean his gun and his body after "popp[ing] someone." Eugene Herrod testified that Arrington admitted that he "fanned Shorty down" and vowed to "finish the job and get Shorty" after learning that he had shot the wrong person. The defendant himself admitted to changing his hair and appearance following the shooting to hide from law enforcement.

¶78 Arrington's evidence in response to this testimony is comparatively weak. Regarding his on-going feud with Shorty, Arrington testified that he had forgiven Shorty for stabbing him and that he had not been the one to rob Shorty. Arrington explained that he was only at Taylor's house to get drugs and that he shot at Shorty only when he saw Shorty reaching for something. In addition, Arrington said he aimed only at the

bottom of the porch, rather than shooting to injure or kill. Linzmeier testified that Arrington had not raised self-defense until almost a year after the shooting of Gomez. Linzmeier had heard nothing about Shorty having a gun until Arrington's interview with him in the jail.

¶79 Arrington further denied all testimony that implied that he tried to cover up evidence. For example, Arrington described AVT's testimony as "all lies." When questioned about Eugene Herrod's testimony, that Arrington told him he would "finish the job and get Shorty," Arrington replied, "I don't know why Eugene told you guys that."

¶80 As both parties acknowledge, the scientific evidence in this case did not definitively confirm or refute either side's theory.[14] Instead, this case turned on the credibility of each side's witnesses. The State had detailed testimony from numerous witnesses who testified to Arrington's actions before, during, and after the shooting. Arrington countered that the State's witnesses were spreading lies and making things up. Even without Miller's recordings, Arrington's testimony was sufficiently discredited by the multiple witnesses who all corroborated the State's theory of the case. The recordings merely provided additional discrediting support. Upon our examination of the totality of the evidence, we conclude that

---

[14] Arrington, 398 Wis. 2d 198, ¶47 ("The prosecutor conceded in the State's closing argument that '[s]cience in this case hasn't been able to prove anything really for sure.'"); Def. Appellant Br. at 40-43.

the result of the trial would not have been different without the introduction of Miller's recordings. Accordingly, we further conclude that the admission of Miller's recordings at trial did not prejudice Arrington. Therefore, a new trial is not warranted.

### III. CONCLUSION

¶81 We conclude that Arrington's Sixth Amendment right to counsel was not violated because Miller was not acting as a State agent when he recorded his conversations with Arrington. Further, a new trial is not warranted because Arrington's counsel's performance was not deficient and Arrington was not prejudiced by his counsel's failure to object to the State's use of the recordings. Accordingly, we reverse the decision of the court of appeals and affirm the circuit court's judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶82 REBECCA FRANK DALLET, J. (*concurring*). This case involves a textbook example of a Sixth Amendment violation. In a series of cases culminating nearly 40 years ago, the U.S. Supreme Court held that the police violate a defendant's Sixth Amendment right to counsel when they use a jailhouse informant to secretly gather incriminating statements from the defendant. The majority misapplies that law, concluding that Arrington's right to counsel was somehow not violated when a jailhouse informant, using a recording device provided by the police, interrogated Arrington and recorded him making incriminating statements. That said, there is no reasonable probability the jury would have reached a different outcome if Arrington's recorded statements or the informant's testimony had been suppressed, because neither was inconsistent with Arrington's defense theory. And so, although Arrington's trial counsel's performance was deficient for failing to move to suppress those statements, it did not prejudice Arrington's defense. I therefore agree with the majority opinion's conclusion reversing the court of appeals' decision.

I

¶83 While he was incarcerated in the Brown County Jail, Jason Miller "agree[d] to cooperate with law enforcement and wear a . . . recording device" in exchange for "consideration" in his case. Initially, Miller was gathering information regarding an unrelated homicide case (the "Powell case") that Green Bay Detectives Wanta and Linzmeier were investigating.

1

The detectives had provided Miller with a digital recording device to "help facilitate" his information-gathering activities, and they instructed him on how to use it. Wanta would pick up the recordings each day and provide Miller with a "fresh" recording device. Wanta assured Miller that "the information [Miller] would gather would . . . be used as part of his consideration" in his case. He explained that, although the final consideration decisions are made by the district attorney, generally the more information an informant produces, the more he gets in return.

¶84 Several days after Miller began working with the detectives, Arrington was arrested and placed in Miller's cell block and started speaking to Miller about his case. Miller then asked the detectives if he should record his conversations with Arrington in addition to those related to the Powell case. Linzmeier, who was investigating Arrington's case (Wanta was not), told Miller that he should. Miller's first recording in both cases occurred on April 11. Wanta collected the recording device each day, and reviewed the recordings and passed along to Detective Linzmeier any information related to Arrington's case. Linzmeier then prepared reports detailing the information he received from Miller.

¶85 Miller initiated conversations with Arrington between April 11 and 13 and he recorded each one. On April 11, Miller went to Arrington's cell and asked him if he wanted to read a magazine. Arrington testified at the post-conviction hearing that, although he wasn't sure, he believed that Miller asked to see Arrington's criminal complaint. The next day, Miller called

2

Arrington over to Miller's cell so they could talk. The third day, April 13, is the when the conversation occurred that was played at Arrington's trial.

¶86 During that conversation, Miller interrogated Arrington about his case, including asking him how he "handled" what Miller thought was problematic evidence against him. For instance, regarding possible gunshot-residue evidence, Miller asked Arrington if he "g[o]t rid of it"; if he "wipe[d] everything down." Miller testified that, at the time, neither he nor Arrington knew whether the police had, in fact, collected or tested any gunshot-residue evidence. Miller also questioned Arrington about his version of the shooting. Arrington told him that he was sitting in his car with a woman when he saw two people, Gomez and Santana-Hermida (also known as "Shorty"), talking to each other outside of Taylor's house. Santana-Hermida and Arrington had a violent history: three days before the shooting, Santana-Hermida had stabbed Arrington. Arrington told Miller that seeing Santana-Hermida in the driveway gave him a "flashback" to Santana-Hermida stabbing him, which Arrington claimed caused him to "just [start] shooting." Miller asked Arrington if he "hit the wrong person." Arrington responded that he "hit Ricky [Gomez]" because "[Santana-Hermida] jumped out of the way." After Arrington told Miller that Santana-Hermida was unlikely to testify at trial, Miller commented that the woman who was in the car with him was the only witness Arrington had to "worry about," as she was the only other

3

eyewitness.[1] Miller then suggested that Arrington should arrange for the woman's friends to convince the woman not to come to court.

¶87 At trial, Arrington took the stand and testified that he had started shooting in self-defense. He testified that Santana-Hermida had previously "made an attempt [on his] life" and that, before he started shooting, he saw Santana-Hermida "reach for what [he] thought was a gun." Arrington described firing three shots toward the bottom of the porch to "create a diversion" allowing him to drive away. He asserted that he "purposely" shot at the porch and not any person because he "didn't want to hit anybody." According to Arrington's testimony, as he started to drive away, he saw Santana-Hermida "come around the door with the gun in his hand at the same time . . . Gomez was coming into the house," at which point Santana-Hermida fired and Gomez fell. Arrington claimed that Gomez had "tried to move out of the way, but he was too late." The jury ultimately rejected Arrington's self-defense theory, convicting him of first-degree intentional homicide.

¶88 Arrington sought post-conviction relief on the grounds that his trial counsel was ineffective for failing to move to suppress Miller's testimony and jailhouse recording. At his post-conviction hearing, Arrington explained that he did not know that Miller was a police informant or that Miller was wearing a recording device when they talked in jail, and that he

---

[1] Taylor, whose house the shooting occurred at, also testified, but he said he did not see the shooting. Santana-Hermida was on the State's pre-trial witness list, but he did not testify at trial.

4

would not have talked to Miller had he known Miller was recording their conversations. Arrington's trial counsel, Hughes, testified that he knew the prosecution had recordings of Arrington's conversations with Miller and that he had received those recordings "quite some time" before trial. Based on those recordings and police reports the State turned over before trial, Hughes said that he was "aware that Jason Miller [was] working as a confidential informant" while he was in the Brown County jail. He also knew that Miller recorded his conversations with Arrington after Arrington had obtained counsel. Yet Hughes said that he did not consider whether Miller's recordings violated Arrington's right to counsel—indeed, he had never even researched the issue. Finally, Hughes admitted that if he hadn't "missed" the issue, he "likely would have" filed a pretrial motion to suppress Miller's testimony and jailhouse recording.

## II

¶89 Once a defendant's Sixth Amendment right to counsel attaches, the State has an "affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking th[at] right." Maine v. Moulton, 474 U.S. 159, 176 (1985). That obligation bars the police not only from directly questioning the defendant without his counsel present but also from using an informant to "deliberately elicit[]" incriminating information from the defendant. See Massiah v. United States, 377 U.S. 201, 206 (1964). The Sixth Amendment's protections extend to information deliberately obtained by the State through

5

an agent, such as a jailhouse informant, preventing the police from circumventing a defendant's right to counsel via an indirect source:

> An accused speaking to a known Government agent is typically aware that his statements may be used against him. The adversary positions at that stage are well established; the parties are then "arms' length" adversaries.
>
> When the accused is in the company of a fellow inmate who is acting by prearrangement as a Government agent, the same cannot be said. Conversation stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents. Indeed, the Massiah Court noted that if the Sixth Amendment "is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." The Court pointedly observed that Massiah was more seriously imposed upon because he did not know that his codefendant was a Government agent.

United States v. Henry, 447 U.S. 264, 273 (1980). The U.S. Supreme Court has explained that even when the police do not purposely place an informant in jail with the defendant, their "knowing exploitation" of such "an opportunity to confront the accused without counsel being present is as much a [Sixth Amendment violation] as is the intentional creation of such an opportunity." Moulton, 474 U.S. at 176. Determining whether the police's use of an informant violates a defendant's Sixth Amendment right to counsel turns on three factors: (1) the informant is an agent of the police; (2) the informant is "ostensibly no more than a fellow inmate" of the defendant's; and (3) the informant takes "some action" to "deliberately . . . elicit" incriminating information after the defendant has been indicted and placed in custody. See Henry,

6

447 U.S. at 270; Kuhlmann v. Wilson, 477 U.S. 436, 459-60 (1986). There is no dispute that the second factor is present here. The issues before the court are whether Miller was an agent of the police and whether he took some action to deliberately elicit incriminating information from Arrington.

A

¶90 Regarding whether an informant is an agent of the police, the majority wrongly looks to state law agency principles. That novel approach has no support in either Wisconsin or federal case law——unsurprising, given that no state law can deprive a person of a federal constitutional right. See, e.g., Kansas v. Garcia, 140 S. Ct. 791, 801 (2020). Accordingly, the correct place to look for how to analyze whether someone is an agent of the police for Sixth Amendment purposes is the U.S. Supreme Court's Sixth Amendment jurisprudence.

¶91 The Court's jurisprudence reveals that an agent is a certain kind of informant; not every person who reports information to the police is an agent of the police. Rather, a person is an agent if she obtains information from the defendant pursuant to an agreement with the police. See Henry, 447 U.S. at 270. Evidence of such an agreement includes a promise by the police to compensate the informant for information, either with money or by reducing the informant's sentence or the charges against him. See id. at 270 & n.7. Such agreements don't have to be formal or written; all that is needed is some "evidence that the parties behaved as though there were an agreement

7

between them." See United States v. York, 933 F.2d 1343, 1357 (7th Cir. 1991), overruled on other grounds by Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999). And the agreement doesn't have to specify exactly what consideration the informant will receive, so long as there is some evidence that the reason the informant gave the police information is because the government "assured [him] that his good deeds would not go unrewarded." See id. at 1358. Fundamentally, the question turns on whether there was some "prearrangement" between the informant and the police to collect information on the defendant, as opposed to the informant acting on his own initiative prior to any contact with the police. See Henry, 447 U.S. at 270–71; United States v. Malik, 680 F.2d 1162, 1165 (7th Cir. 1982).

¶92 Just because an informant is an agent of the police, however, does not mean that everything the agent does amounts to a violation of a defendant's right to counsel. The Sixth Amendment is not violated when the State obtains incriminating information by "luck or happenstance," Moulton, 474 U.S. at 176, because the State is not obligated to protect defendants from their own "loose talk," see Malik, 680 F.2d at 1165. Thus, there is no Sixth Amendment violation when an agent who "only listen[s]" to a defendant's "spontaneous and unsolicited statements" and "at no time ask[s] any questions" reports those statements to the police. Kuhlmann, 477 U.S. at 460. For an agent of the police to violate the Sixth Amendment, the agent must take "some action, beyond merely listening, that was

8

designed deliberately to elicit incriminating remarks."  Id. at 459.

B

¶93  Here, the record clearly demonstrates that Miller was an agent of the police and that his actions violated Arrington's right to counsel.

1

¶94  Regarding Miller being an agent of the police, Miller approached police about recording his conversations with Arrington "while he was still working as an informant" in the Powell case.  The police had already given Miller a recording device and assured him that information he gathered in the Powell case "would . . . be used as part of his consideration." Detective Linzmeier then gave Miller the go-ahead to record his conversations with Arrington.  Armed with both the understanding that he would receive consideration in exchange for information and a police-issued recording device, Miller questioned Arrington about his case and recorded those exchanges. According to Wanta, the "first day that [Miller] made a recording for . . . [the Powell case] was on the 11th"——the same day that Miller made his first recording of Arrington.  Miller questioned and recorded Arrington for two more days, with Wanta collecting the recording device and replacing it with a "fresh" one each day.  Under these circumstances, Miller was an agent of the police when he questioned and recorded Arrington.  See Henry, 447 U.S. at 273 (explaining that a jailhouse informant is an agent of the police when he is "acting by prearrangement"

9

with the police to "stimulate[]" conversation with the defendant).

¶95 The majority floats two explanations for why Miller wasn't an agent of the police, neither of which is supported by case law or the record. First, it claims that Miller's consideration agreement was only for the unrelated homicide case and that without the police instructing him to target Arrington specifically, he was not acting as an agent of the police when he questioned Arrington. That approach, however has been rejected by many other courts, both federal and state and it has never been adopted by the U.S. Supreme Court. See, e.g., Henry, 447 U.S. at 271; Ayers v. Hudson, 623 F.3d 301, 311 (6th Cir. 2010) (explaining that "direct" instructions to target the defendant "would be sufficient to demonstrate agency," but they were not necessary (emphasis added)); York, 933 F.2d at 1357 ("Whether the principal exercises its control strictly, by targeting specific individuals, or casually, by loosing an informant on the prison population at large, is irrelevant."); State v. Marshall, 882 N.W.2d 68, 94 (Iowa 2016) ("The invasion of an incarcerated prisoner's Sixth Amendment rights is not affected by whether the informant is operating at large or with a specific target."). There are good reasons why not: the majority's simplistic, bright-line approach "would allow the State to accomplish 'with a wink a nod' what it cannot do overtly." See Ayers, 623 F.3d at 312. That is why determining whether an informant is an agent of the police turns on "the facts and circumstances of a particular case," id. at 311, which

here demonstrate that Miller was such an agent when he questioned Arrington.

¶96 Second, the majority asserts that Miller was not an agent because the police made him no specific promise about the consideration he would receive for gathering information on Arrington. That may be true, but it doesn't mean Miller wasn't a government agent. As both Wanta and Linzmeier testified, they do not promise specific consideration in advance. Instead, the district attorney negotiates the specifics after the fact, based on the usefulness of the information the informant gathers. Thus, if the majority were right that the absence of a specific promise in Arrington's case meant that Miller wasn't an agent of the police, then it's unclear how anyone could ever be.

¶97 But that is not the law. What matters for determining whether someone is a government agent isn't whether they have a promise of specific consideration in hand before gathering information, but whether there was a "prearrangement" with the police to gather the information, Henry 447 U.S. at 270-71, and whether the police and the informant "behaved as though" there was an agreement between them, York, 933 F.2d at 1357-58. Both of these conditions are met here. There is no question that the police told Miller that the information he gathered "would . . . be used as part of his consideration." To be sure, they made that arrangement with Miller regarding the Powell case and before Arrington arrived at the jail. But it was mere days later that Miller approached the police about also recording his conversations with Arrington. And the police never told Miller that the information-for-consideration deal applied only to the

11

Powell case. In fact, they gave Miller the green light to record Arrington. Thus, when Miller questioned and recorded Arrington——using the same police-issued device, on the same day he recorded Powell, and after "prearrang[ing]" with the police to do so, see Henry, 447 U.S. at 273——both Miller and the police were "behav[ing] as though" the general consideration arrangement in the Powell case applied equally to Arrington's case.[2] See York, 933 F.2d at 1357-58 (holding that the police promising some reward for information and evidence the parties behaved consistent with that understanding is sufficient to establish an agreement between the informant and the police); Massiah, 377 U.S. at 206. Accordingly, Miller was an agent of the police.

2

¶98 Miller also took "some action" to deliberately elicit information from Arrington, and therefore violated Arrington's Sixth Amendment right to counsel. See Kuhlmann, 477 U.S. at 459. In fact, Miller acted exactly as the police agents did in Moulton and Henry. Miller wore a recording device given to him by the police and engaged Arrington in "prolonged discussion of the pending charges," asking Arrington "what actually had occurred." See Moulton, 474 U.S. at 165; Henry, 447 U.S. at 271, 274. He asked Arrington "what the State's evidence would

---

[2] The district attorney's eventual offer of specific consideration confirms that understanding, as it states that the "offer contemplates consideration" for Miller's information and testimony regarding both "Powell and Arrington" (emphasis added).

12

show," including possible gunshot residue. See Moulton, 474 U.S. at 165; Henry, 447 U.S. at 271, 274. And he suggested "what [Arrington] should do to obtain a verdict of acquittal"——namely, that Arrington should convince the woman who was with him in the car at the shooting not to testify. See Moulton, 474 U.S. at 165. Miller was no "passive listener"; he actively conversed with Arrington, and Arrington's "incriminating statements were the product of [those] conversations." See Henry, 447 U.S. at 271; cf. United States v. Moore, 178 F.3d 994, 999 (8th Cir. 1999). Also as in Henry, Miller was already working as a police informant at the time he arranged to record Arrington's statements. See Henry, 447 U.S. at 270-71. As far as Arrington knew, however, Miller was "no more than a fellow inmate," giving Arrington a false sense that he was not talking to the police. See id. at 270, 272-73. Thus, Arrington's Sixth Amendment to counsel was violated.

¶99 The majority's opposite conclusion rests on its misunderstanding of both the U.S. Supreme Court's Sixth Amendment precedents and the Wisconsin court of appeals decision in State v. Lewis, 2010 WI App 52, 324 Wis. 2d 536, 781 N.W.2d 730. In claiming that Miller is like the informant in Kuhlmann, the majority ignores the fact that the Kuhlmann Court limited its holding to an informant who "merely listen[s]" but does not engage with the defendant. See 477 U.S. at 459. As explained above, however, Miller "took some action . . . that was designed deliberately to elicit incriminating remarks" from Arrington. See id. Indeed, he took far more than some action—— he sought out Arrington for a lengthy conversation about the

13

charges against him, the State's case, and strategized with Arrington about how to obtain an acquittal, including suggesting that Arrington encourage the only other eyewitness not to testify. See Moulton, 474 U.S. at 165; Henry, 447 U.S. at 267. Simply put, this case is not Kuhlmann. The majority likewise errs in its reliance on Lewis. There, the informant had gathered information on the defendant prior to any discussion with the police about the defendant. See Lewis, 324 Wis. 2d 536, ¶¶4-6. Here, however, Miller gathered information on Arrington only after he told the police that he could get Arrington to talk and the police outfitted him with a recording device and told him to record Arrington's statements.

¶100 The majority also focuses on the wrong facts. It doesn't matter that the police did not tell Miller what questions to ask or what to record. See majority op., ¶¶66-68. The Henry Court rejected that distinction 42 years ago, concluding that what matters is that the police knew that Miller "had access to [Arrington] and would be able to engage him in conversations without arousing [Arrington's] suspicions" and without Arrington's counsel present. See 477 U.S. at 270-71 & n.8. Likewise, it doesn't matter that it was Miller's idea to record Arrington. See majority op., ¶¶61-65. As the Moulton Court put it, that position "fundamentally misunderstands the nature of the right [to counsel]." 474 U.S. at 174-76. The Court clarified that "the identity of the party who instigated the meeting at which the Government obtained incriminating statements [is] not decisive or even important." Id. at 174 (adding that the Court in Beatty v. United States, 389 U.S. 45

14

(1967) (per curiam), had summarily reversed a conviction even though the defendant requested a meeting with an undercover informant and led the conversation). It then explained that the Sixth Amendment is violated when the police "knowing[ly] exploit[] . . . an opportunity to confront the accused without counsel being present," regardless of who initiates the confrontation. Id. at 176. Here Miller presented the police with an opportunity to confront Arrington about his case without his counsel present and the police knowingly exploited that opportunity, thus improperly "circumventing" Arrington's Sixth Amendment right to counsel. See id.

¶101 The U.S. Supreme Court's cases therefore make clear that Arrington's Sixth Amendment right to counsel was violated when Miller, acting as an agent of the police, asked Arrington questions about his case and used the police-provided recording device to secretly record those conversations.

III

¶102 Because the law is clear that Arrington's Sixth Amendment right to counsel was violated, his trial counsel's performance was deficient for failing to raise a Sixth Amendment challenge. For different reasons than the majority, however, I conclude that counsel's error did not prejudice Arrington.

¶103 An ineffective-assistance-of-counsel claim requires the defendant to show both prongs of the Strickland test: "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Savage, 2020 WI 93, ¶27, 395

15

Wis. 2d 1, 951 N.W.2d 838. Deficient performance is performance that falls "below an objective standard of reasonableness." State v. Jenkins, 2014 WI 59, ¶36, 355 Wis. 2d 180, 848 N.W.2d 786. Generally, the court is "highly deferential to the reasonableness of counsel's performance," provided there is some strategic reason for counsel's decisions. Id. But because there is almost never a strategic reason for "fail[ing] to raise an issue of settled law," such a failure generally meets Strickland's first prong. See, e.g., Savage, 395 Wis. 2d 1, ¶37; State v. Breitzman, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93. Prejudice to the defense is established when "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id., ¶32 (quoting Strickland, 466 U.S. at 694).

¶104 Here, Arrington's counsel's performance was deficient because Arrington's Sixth Amendment right to counsel was violated when the police provided Miller with a recording device and Miller then interrogated Arrington and recorded him making incriminating statements. Arrington's counsel therefore had a clear duty to raise the issue and he did not. Cf. Breitzman, 378 Wis. 2d 431, ¶49. Indeed, counsel testified that he had not even researched the issue. Such performance is objectively unreasonable and, therefore, deficient under the first prong of Strickland. See Jenkins, 355 Wis. 2d 180, ¶47 (concluding that counsel's performance was deficient because it was not the result of "any reasonable trial strategy").

¶105 The second prong of Strickland's test is not met, however, because even with counsel's error, there is no

16

reasonable probability that the jury would have reached a different verdict. The question is not whether the jury would have acquitted Arrington of all charges absent counsel's error, but rather whether there is a reasonable probability the jury would have either acquitted Arrington or convicted him of one of the lesser-included charges. See Strickland, 466 U.S. at 695-96. The jury was instructed on the lesser-included charges of second-degree intentional homicide and first- and second-degree reckless homicide.

¶106 Miller's testimony and jailhouse recording likely had no effect on the jury's contemplation of first- versus second-degree homicide. To convict Arrington of second-degree intentional homicide, the jury would have had to find that Arrington believed he had to kill Santana-Hermida to save his own life but that Arrington's belief was unreasonable. Neither Miller's testimony nor his jailhouse recording, however, contains evidence related to self-defense. Although Miller testified that Arrington told him that when Santana-Hermida saw Arrington at Taylor's house, Santana-Hermida was acting "overly aggressive" and made a "challenging" gesture to Arrington, Miller also testified that Arrington did not say anything about Santana-Hermida having a gun or otherwise threatening him. Thus, nothing in Miller's testimony or jailhouse recording speaks to the factual predicates for self-defense——whether Arrington believed he was in imminent danger of death or great bodily harm and that he needed to fire three shots to repel that threat. The evidence the jury had on Arrington's self-defense

17

claim is therefore the same with or without Miller's testimony and jailhouse recording.

¶107 Similarly, nothing in Miller's testimony or jailhouse recording was antithetical to a jury finding Arrington guilty of the lesser-included offense of reckless homicide. To convict Arrington of first- or second-degree reckless homicide, the jury would need to find that Arrington shot Gomez and that he was aware that shooting at Taylor's house created an unreasonable and substantial risk of great bodily harm or death. See Wis. Stat. §§ 940.02 (first-degree reckless homicide also requires a finding that the circumstances show an "utter disregard for human life"); 940.06. Arrington told Miller that he "just started shooting" after he had a "flashback" to Santana-Hermida stabbing him and that he hit Gomez when he was shooting at the house. Those statements are consistent with what Arrington said on the stand when he claimed that he shot at the house to create a distraction so he could drive away. Miller's testimony and jailhouse recording are also consistent with the only other eyewitness's testimony——the woman in the car with Arrington. She told the jury that Arrington "just started shooting," but did not specify who or what Arrington was shooting at.[3] Therefore, the substance of Miller's testimony and jailhouse recording did not prevent the jury from concluding that Arrington did not intend to shoot Santana-Hermida or Gomez or

---

[3] The woman's testimony also supports a finding that Arrington intended to kill Santana-Hermida and instead killed Gomez. Nothing in her testimony forecloses a finding that Arrington acted recklessly, however.

18

that he knowingly created an unreasonable and substantial risk of their death by firing at the house.

¶108 Ultimately, Miller's testimony and jailhouse recording neither supported nor foreclosed the possibility that the jury could convict Arrington of reckless homicide. Accordingly, there is no reason to suspect that it had an impact on the jury rejecting the reckless-homicide charge and convicting Arrington of first-degree intentional homicide. As a result, although Arrington's counsel's performance was deficient in failing to challenge Miller's testimony and jailhouse recording on Sixth Amendment grounds, there is no reasonable probability that, absent that deficient performance, the jury would have reached a different conclusion.

IV

¶109 I agree with the majority that the court of appeals' decision should be reversed, but for different reasons. The majority wrongly interprets the U.S. Supreme Court's precedents, which clearly establish that Arrington's Sixth Amendment right to counsel was violated. Arrington's counsel's failure to raise that obvious violation was objectively unreasonable, but, given the substance of the statements made by Arrington to Miller, counsel's error did not prejudice Arrington's defense. Accordingly, I respectfully concur.

¶110 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this opinion.

19